**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION AT MEMPHIS**

| | |
|---|---|
| CECIL CANNADAY, Derivatively on behalf of Nominal Defendant, HELIOS HIGH INCOME FUND, INC. | ) )  ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BRIAN B. SULLIVAN, J. KENNETH ALDERMAN, CARTER E. ANTHONY, JACK R. BLAIR, THOMAS R. GAMBLE, ALBERT C. JOHNSON, JAMES C. KELSOE, JR., CHARLES D. MAXWELL, JAMES S.R. MCFADDEN, ALLEN B. MORGAN, JR., W. RANDALL PITTMAN, MARY S. STONE, DAVID H. TANNEHILL, JOSEPH C. WELLER, J. THOMPSON WELLER, ARCHIE W. WILLIS, III, MICHELE F. WOOD and MORGAN ASSET MANAGEMENT, INC. | ) Civil Action No.  )  ) **Jury Demand**  )  )  )  ) **VERIFIED SHAREHOLDER** ) **DERIVATIVE COMPLAINT** )  )  )  )  )  ) |
| Defendants, | ) ) |
| and | ) ) |
| HELIOS HIGH INCOME FUND, INC. | ) ) |
| Nominal Defendant. | ) ) |
| _____ | ) |

Plaintiff Cecil Cannaday ("Plaintiff"), by the undersigned attorneys, submit this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and allege upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant Helios High Income Fund, Inc. ("Helios High" or the "Fund")[1] against certain of its former officers and directors and its former investment advisor, Morgan Asset Management, Inc. ("MAM"), seeking to remedy their breaches of fiduciary duties, unjust enrichment, and other violations of law.

2.      On or about April 16, 2003, the Fund filed with the U.S. Securities and Exchange Commission ("SEC") on Form N-2 and disseminated to investors a Registration Statement. Thereafter, on or about May 28, 2003 and June 23, 2003, the Fund filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on June 26, 2003, the Fund filed with the SEC a Prospectus (collectively, these documents are referred to as the "Prospectus").   The Prospectus explicitly incorporated by reference a Statement of Additional Information attached thereto and all other exhibits.

3.      The Fund touts the diversification of its portfolio.  Specifically, the Prospectus describes the Fund as a ***diversified***, closed-end management investment company.  Pursuant to the Prospectus, the investment objective of the Fund includes "investing a majority of its total assets in a diversified portfolio of below investment grade debt securities offering attractive yield

---

[1] The Fund was formerly known as Regions Morgan Keegan High Income Fund, Inc. or RMK High Income Fund, Inc.

and capital appreciation potential."

4.      In breach of their fiduciary duties, Defendants (as defined herein) knowingly: (a) caused the Fund to invest heavily in Asset Backed Securities ("ABS"), Mortgage Backed Securities ("MBS"), Collateralized Debt Obligations ("CDO") and other illiquid and subprime securities; (b) failed to disclose to the Fund's shareholders the true extent of the Fund's exposure to these securities and the risks associated therewith; and (c) overstated the values of the ABS, MBS, CDOs and other illiquid and subprime securities the Fund held.

5.      As a result of Defendants' breaches of fiduciary duties, the Fund has suffered severe losses in value and has paid MAM excessive management fees, as alleged in detail herein.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this Complaint states a federal question.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

8.     Plaintiff Cecil Cannaday is a shareholder of the Fund, was a shareholder of the Fund at the time of the wrongdoing alleged herein, and has been a shareholder of the Fund continuously since that time.  Cannaday is a citizen of the State of Arkansas.

9.     Nominal Defendant Helios High is closed-end management investment company incorporated in Maryland with its principal executive offices located at Three World Financial Center, 200 Vesey Street, 10th Floor, New York, New York 10281-1010.

10.     Defendant Brian B. Sullivan ("Sullivan") served as President and director of the Fund from 2006 through 2008.  Upon information and belief, Defendant Sullivan is a citizen of the State of Alabama.

11.     Defendant J. Kenneth Alderman ("Alderman") served as Chairman of the Fund's Board of Directors (the "Board") from 2006 through 2008 and as director of the Fund from 2004 through July 2008.  Upon information and belief, Defendant Alderman is a citizen of the State of Alabama.

12.     Defendant Carter E. Anthony ("Anthony") served as President and director of the Fund from 2004 through 2006.  Upon information and belief, Defendant Anthony is a citizen of the State of Alabama.

13.     Defendant Jack R. Blair ("Blair") served as a director of the Fund from 2005 through July 2008.  Upon information and belief, Defendant Blair is a citizen of the State of Tennessee.

14.     Defendant Thomas R. Gamble ("Gamble") served as a Vice President and director of the Fund from 2003 through July 2008.  Upon information and belief, Defendant Gamble is a citizen of the State of Alabama.

15.     Defendant Albert C. Johnson ("Johnson") served as a director of the Fund from 2005 through 2009.  Upon information and belief, Defendant Johnson is a citizen of the State of Alabama.

16.     Defendant James C. Kelsoe, Jr. ("Kelsoe") served as a Senior Portfolio Manager for the Fund from 2004 through July 2008.  Upon information and belief, Defendant Kelsoe is a citizen of the State of Tennessee.

17.     Defendant Charles D. Maxwell ("Maxwell") served as a director of the Fund from 2003 through 2008 and also served as Secretary and Assistant Treasurer of the Board from 2003 through 2008.   Upon information and belief, Defendant Maxwell is a citizen of the Commonwealth of Virginia.

18.     Defendant James S.R. McFadden ("McFadden") served as a director of the Fund from 2004 through 2008.  Upon information and belief, Defendant McFadden is a citizen of the State of Tennessee.

19.     Defendant Allen B. Morgan, Jr. ("Morgan") served as Chairman of the Board and director of the Fund from 2004 through 2006.  Upon information and belief, Defendant Morgan is a citizen of the State of Tennessee.

20.     Defendant W. Randall Pittman ("Pittman") served as a director of the Fund from 2004 through 2008.  Upon information and belief, Defendant Pittman is a citizen of the State of Alabama.

21.     Defendant Mary S. Stone ("Stone") served as a director of the Fund from 2003 through 2008.   Upon information and belief, Defendant Stone is a citizen of the State of Alabama.

22.     Defendant David H. Tannehill ("Tannehill") served as Assistant Portfolio

Manager of the Fund from 2006 through 2008.  Upon information and belief, Defendant Tannehill is a citizen of the State of Tennessee.

23.     Defendant Joseph C. Weller ("Joseph Weller") served as Treasurer and director of the Fund from 2004 through 2006.  Upon information and belief, Defendant Weller is a citizen of the State of Tennessee.

24.     Defendant J. Thompson Weller ("Thompson Weller") served as Treasurer of the Fund from 2006 through 2008 and as Assistant Secretary and director of the Fund from 2003 through 2008.  Upon information and belief, Defendant Thompson Weller is a citizen of the State of Tennessee.

25.     Defendant Archie W. Willis, III ("Willis") served as a director of the Fund from 2003 through 2008.  Upon information and belief, Defendant Willis is a citizen of the State of Tennessee.

26.     Defendant Michele F. Wood ("Wood") served as a Chief Compliance Officer and director of the Fund from 2006 through 2008.  Upon information and belief, Defendant Wood is a citizen of the State of Tennessee.

27.     Defendant MAM is incorporated in Tennessee with its principal executive offices located at Fifty North Front Street, Memphis, Tennessee 38103 and describes itself as an active investment manager.  MAM served as the Fund's investment adviser until August 2007.

28.     Collectively, defendants Sullivan, Anthony, Alderman, Blair, Gamble, Johnson, Kelsoe, Maxwell, McFadden, Morgan, Pittman, Stone, Tannehill, Joseph Weller, Thompson Weller, Willis and Wood are herein referred to as the "Individual Defendants."  The Individual Defendants and MAM are herein referred to as "Defendants."

## DUTIES OF THE DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Fund and because of their ability to control the business and corporate affairs of the Fund, the Individual Defendants owed the Fund and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Fund in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Fund and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Fund owes to the Fund and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Fund and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Fund, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of the Fund were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Fund.  By virtue of such duties, the officers and directors of the Fund were required to, among other things:

a.     exercise good faith in ensuring that the affairs of the Fund were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Fund;

b.     exercise good faith in ensuring that the Fund was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements; and

c.     when put on notice of problems with the Fund's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent is recurrence.

32.     The Code of Ethics for Principal Executive and Principal Financial Officers of the

Fund states that:

### Disclosure & Compliance

- Each Covered Officer should familiarize himself with the disclosure requirements generally applicable to the Fund;

- Each Covered Officer should not knowingly misrepresent, or cause others to misrepresent, facts about the Fund to others, whether within or outside the Fund, including to the Fund's directors/trustees and auditors, and to governmental regulators and self-regulatory organizations;

- Each Covered Officer should, to the extent appropriate within his area of responsibility, consult with other officers and employees of the Fund and the Fund's adviser or any sub-adviser with the goal of promoting full, fair, accurate, timely and understandable disclosure in the reports and documents the Fund files with, or submit to, the SEC and in other public communications made by the Fund; and

- It is the responsibility of each Covered Officer to promote compliance with the standards and restrictions imposed by applicable laws, rules and regulations.

33.     As the Fund's advisor, MAM likewise owed to the Fund the fiduciary duties of

good faith, trust, loyalty and due care.

### SUBSTANTIVE ALLEGATIONS

### Background of the Fund

34.     The Prospectus set forth the investment strategy of the Fund, stating: "The Fund

will seek to achieve its investment objectives by investing a majority of its total assets in a

diversified portfolio of below investment grade debt securities offering attractive yield and

capital appreciation potential."

35.     The Prospectus also describes the management of the fund.  Specifically, "[t]he

Fund's Board provides broad supervision over the affairs of the Fund, including supervision of

the duties performed by the Adviser. The officers of the Fund are responsible for the Fund's

operations."

36.     Furthermore, MAM "will provide the Fund with investment research and advice and furnish the Fund with an investment program consistent with the Fund's investment objectives and policies, subject to the supervision of the Fund's Board. The Adviser will determine which portfolio securities will be purchased or sold, arrange for the placing of orders for the purchase or sale of portfolio securities, select brokers or dealers to place those orders, maintain books and records with respect to the Fund's securities transactions and report to the Board on the Fund's investments and performance."  However, the "[d]ay-to-day management of the Fund's portfolio will be the responsibility of a team of fixed-income analysts and portfolio managers led by James C. Kelsoe, Jr., CFA."

37.     As stated in the Prospectus, "[u]nder the advisory agreement, the Fund will pay to the Adviser monthly, as compensation for the services rendered and expenses paid by it, a fee equal on an annual basis to 0.65% of the Fund's average daily Managed Assets. Under the administration agreement, the Fund will pay to the Adviser monthly, as compensation for the services rendered and expenses paid by it, a fee equal on an annual basis to 0.15% of the Fund's average daily Managed Assets."  Pursuant to the Prospectus, "Managed Assets" is defined as "the Fund's average daily total assets (including any assets attributable to any leverage) minus the sum of accrued liabilities other than debt entered into for purposes of leverage."

38.     The Prospectus also states that "[u]nder the supervision of the Board, [MAM] determines the liquidity of the Fund's investments and, through reports from the Adviser, the Board monitors investments in illiquid instruments."  It further describes how the Fund values illiquid investments such as sub-prime loans, which are "investments that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are

valued," namely, that "[i]n the absence of market quotations, illiquid investments are priced at fair value *as determined in good faith by a committee appointed by the Board*."

### Defendants' Misconduct

39.     Beginning in 2007, Defendants knowingly caused the Fund to become overly concentrated in risky illiquid securities, including MBS, ABS and subprime securities, and knowingly caused the Fund to materially misrepresent its financial condition and performance by failing to disclose the full extent of the Fund's losses on its investments in these risky illiquid securities.

40.     For example, Defendants knowingly caused the Fund to invest heavily in CDOs, which are a type of structured ABS whose value and payments are derived from a portfolio of fixed-income underlying assets.  As of June 30, 2006, the Fund invested 12.9% of its assets in CDOs.  However, as of June 30, 2007, just one year later, the Fund had increased its investment in CDOs by almost three times to 37.8%.

41.     Defendants knowingly failed to price the Fund's illiquid investments, including CDOs, at a "fair value," as they knowingly excluded relevant and available information that clearly indicated that the stated values of the Fund's assets were too high.  As early as the end of 2006, industry analysts recognized that subprime mortgage foreclosures were on the rise and predicted trouble in the mortgage market, which signaled enormous risks and potential losses to investors.

42.     As noted in an October 10, 2006 article in INVESTOR'S BUSINESS DAILY, entitled "Risky New Loans Add Unknowns As Banks Size Up Housing Drop; Defaults likely will top rates in past downturns -- but by how much?," the number of mortgage foreclosures had increased dramatically.  For instance, "[f]or August [2006], foreclosures surged to 115,292 --

24% higher than in July and 53% higher than a year earlier." Moreover, the Mortgage Bankers Association's delinquency data cited a notable uptick in defaults among subprime loans, particularly those with adjustable rates.

43. On December 19, 2006, the *Dow Jones International News* published an article, entitled "US Housing Policy Group Warns of Subprime Mortgage Foreclosures," stating in relevant part:

> U.S. subprime mortgage foreclosures may rise sharply in the years ahead, with defaults expected for about 15% of the 14 million subprime home loans made in the 1998-2006 period, according to a new forecast from a home finance advocacy group.
>
> "As this year ends, 2.2 million households in the subprime market either have lost their homes to foreclosure or hold subprime mortgages that will fail over the next several years," according to a study released Tuesday by the Center for Responsible Lending. "These foreclosures will cost homeowners as much as $164 billion, primarily in lost home equity."
>
> Lenders typically offer subprime loans to borrowers with impaired credit, charging higher interest rates to compensate for higher credit risk.
>
> The Center for Responsible Lending found subprime mortgages today often include particularly risky attributes such as adjustable rates that are especially low in the early years of repayment, then balloon much higher over time.
>
> The CRL study projects that as housing prices cool, fewer delinquent borrowers will have the home equity to refinance or to sell to avoid foreclosure. For subprime loans made in the past two years, the eventual foreclosure rate will be about 19%, even higher than the rate of the past nine years, it says . . . .

44. On December 19, 2006, *PR Newswire* also reported on the subprime mortgage crisis in an article entitled "Report Reveals 2.2 Million Borrowers Face Foreclosure on Subprime Home Loans; Billions of Home Ownership Wealth to be Lost by Minority Americans; Chart Contains Detailed MSA-Specific Projections of Home Foreclosure Impacts," stating in relevant part:

> A new Center for Responsible Lending (CRL) study reveals that 2.2 million

American households will lose their homes and as much as $164 billion due to foreclosures in the subprime mortgage market. Titled, "Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners," the CRL study is the first comprehensive, nationwide review of millions of subprime mortgages originated from 1998 through the third quarter of 2006.

CRL's research suggests that risky lending practices have triggered the worst foreclosure crisis in the modern mortgage market, projecting that one out of five (19.4%) subprime loans issued during 2005-2006 will fail.

"In the subprime sector, the most vulnerable borrowers are sold the most dangerous loans," said Mike Calhoun, CRL president. "At $164 billion, the losses from foreclosures could pay for the college educations of four million kids. For families who lose their houses because their loans fail, savings and economic security will be way out of reach."

The report discusses a number of factors that drive subprime foreclosures -- in the majority of cases, borrowers receive high-risk loan features, packed into an adjustable rate mortgage with a low start rate, that is approved without considering whether the homeowner can afford to pay the loan after the rate rises.

Adjustable rate mortgages known as 2/28s (or "exploding ARMs") operate with an initial "teaser" rate for two years, followed by a steep payment increase. And, regardless of a borrower's credit history, the almost one- quarter of American families who get subprime loans find them crammed with other high-risk terms such as prepayment penalties, limited income documentation, and no escrow for property taxes and hazard insurance . . . .

45.    As noted in a January 26, 2007 *New York Times* article entitled "More People With Weak Credit Are Defaulting on Mortgages," investors in the subprime market continued to be impacted by the rising mortgage default rates:

Wall Street's big bet on risky mortgages may be souring a lot faster than had been previously thought.

The once booming market for home loans to people with weak credit -- known as subprime mortgages and made largely to minorities, the poor and first-time buyers stretching to afford a home -- is coming under greater pressure. ***The evidence can be seen in rising default rates, increasingly strained finances at mortgage lenders and growing doubts among investors.***

***Now, Wall Street firms, which had helped fuel the growth in the market by bankrolling and investing in subprime mortgage lenders, have begun to pinch off the money spigot.***

12

Several mortgage lenders have recently collapsed. While the failures so far are small in number, some industry officials are concerned that they could be the first in a wave. The subprime sector, which produced loans worth more than $500 billion in the first nine months of last year, could shrink significantly.

***A sharp contraction in subprime mortgages would have ripple effects, reducing consumers' access to credit and affecting investors like foreign central banks, pensions and mutual funds that have been big buyers of mortgage-backed securities.***

*       *       *

"Pick a company -- small, medium or large -- they all have the same problem: capital," said Marc A. Geredes, who runs a small mortgage company, LownHome Financial, in San Jose, Calif. "The economics of the business do not make sense right now."

Wall Street firms were attracted to such lenders because they helped feed a pipeline of securities backed by the mortgages, a market bigger than the one for United States Treasury bonds and notes. Merrill Lynch, for example, securitized $67.8 billion in residential mortgages in the first nine months of 2006, up 58.4 percent from the period a year earlier.

But an increasing number of borrowers are defaulting on subprime loans earlier now than they did a year ago, often within six months of having taken the loan out, shaking Wall Street's confidence in its subprime partners.

In one indication that investors are losing their taste for mortgages, hedge funds that specialize in mortgage-backed securities had an outflow of $1.8 billion in 2006, down from an inflow of $1.8 billion in 2005, according to Hedge Fund Research. It was the only category of hedge funds to have a negative flow for the year.

"We have been and continue to be cautious about the subprime market -- its lending standards, decline in home price appreciation, other deteriorating credit fundamentals," said Jim Higgins, chief executive of Sorin Capital Management.

(emphasis added).

46.     Furthermore, as a result of the subprime mortgage crisis, in mid-2007, two Bear

Stearns Cos. hedge funds that were heavily invested in the subprime-mortgage market collapsed.

47.     Despite this material information clearly indicating that the values of the Fund's

MBS, ABS and CDOs had declined dramatically, Defendants, in violation of Generally Accepted Accounting Principles ("GAAP") and in breach of their fiduciary duties and, with respect to the officers of the Fund, in breach of their duties pursuant to the Fund's Code of Ethics, knowingly and improperly delayed writing down the value of these investments and knowingly failed to disclose the true financial performance of the Fund to its shareholders.

48.     In the Fund's annual shareholder report on Form N-CSR filed with the SEC on June 6, 2007, Defendants eventually began to acknowledge that the Fund's performance had been negatively impacted by the recent turmoil in the mortgage market.  However, the report attempted to downplay the impact, explaining that "[w]hile this downward volatility in the mortgage-backed arena has had a negative impact on the net asset value of the Fund, it has also provided an opportunity to buy assets at considerably higher yields than have been available for more than two years.  Strategically redeploying assets during this market upheaval may be difficult from a net asset value perspective for a period of time, but this is also the best opportunity we have seen in years to secure better portfolio earnings for quarters to come."

49.     Soon after, on August 10, 2007, defendant Kelsoe wrote an open letter to investors admitting, for the first time, that the Fund was having problems valuing its assets:

> I am careful to note the specific timing of this market commentary to provide appropriate context for my remarks given the dramatic market movements taking place hour to hour, and even moment to moment. Because the investment environment is changing so rapidly, I felt it appropriate to provide our shareholders with an update on the impact these conditions are having on the four RMK closed end funds, as well as the RMK Select High Income and Intermediate open end funds.

> One need only look at this morning's headlines to appreciate the global impact of this pervasive de-leveraging event we are now experiencing. What began as a credit event a few months ago mainly affecting sub-prime mortgages has quickly become an unprecedented liquidity issue for the broader financial markets.

> So why is this happening, and what is the impact on our closed end and open end funds? In my opinion, the de-leveraging, or sell-off of securities, by hedge funds

and other financial institutions has created an excessive supply of all types of fixed income securities. This oversupply has pressured the balance sheets of all of Wall Street such that bid/offer spreads have widened and liquidity has dramatically declined over the last 30 to 60 days. Not only is supply higher than demand, but it exceeds the capacity to take these fixed income securities. Additionally, the rating agencies' sudden and drastic actions in downgrading securities have exacerbated these problems by triggering covenant violations and margin calls and creating even more supply in a very thin market.

Just this week, we've learned that a number of mortgage companies are having major problems, including American Home Mortgage, C-Bass, Luminent Mortgage and, most recently, Home Bank. These are not sub-prime lenders, but they are still finding it difficult to get financing to originate loans. Their problems have a direct or indirect impact on the market for all mortgage securities due to their size in the loan origination and servicing arenas.

At the annual shareholder meeting for our closed end funds just four weeks ago, we talked about the distinction between Net Asset Value (NAV) and market value. At that time, market values on all the funds had dropped to be more in line with the underlying NAV, or market value of the securities held in the portfolio. In the past few weeks there has been more volatility and downward pressure on the NAVs as a result of the difficulties in valuing these securities. Unlike stocks that trade openly on exchanges and whose value can easily be determined at any point of the day, mortgage-related securities and CDOs trade via individual bids and offers made on trading desks across Wall Street. As I mentioned earlier, the spreads between bid and offer prices continue to widen.

The lower valuations are no longer just showing up in the sub-prime mortgage securities as we have seen the pressure move further up the credit ladder to impact even AAA-rated bonds. Every fixed income security is subject to being devalued in this market, without regard to credit quality.  Even bonds which continue to meet their payment schedules are under pricing pressure now. Commercial and corporate credit are feeling the crunch, and it is even beginning to touch stock values.

As has been our practice with regard to the dividend, we will provide information to our board in the coming weeks in regard to the income expectations of the portfolios for the next few months. The board is scheduled to meet later this month to determine the dividend payout rate for the near term.

During my 20 year career, these are truly unprecedented times. Amidst these difficult circumstances, I assure you of my continuing commitment to do all that I can to take care of our shareholders' best interests.

50.     Then just four days later, on August 14, 2007, in a Form 8-K, the Fund reported

that:

An independent valuation consultant has been retained to assist in determining the fair value of certain portfolio securities of RMK High Income Fund, Inc. (the "Fund"). Recent instability in the markets for fixed income securities, particularly mortgage-backed and asset-backed securities, has made it more difficult to obtain realistic values for some of the Fund's portfolio securities. In the absence of reliable market quotations, portfolio securities are valued by the Fund's investment adviser at their "fair value" under procedures established and monitored by the Fund's Board of Directors. The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process. Fair valuation procedures have been used to value a substantial portion of the assets of the Fund with input from the valuation consultant and these valuations are reflected in the daily net asset value of the Fund's shares.

51.     On a semi-annual shareholder report on a Form N-CSRS filed with the SEC on December 5, 2007, the Fund disclosed the massive losses in the Fund's MBS and ABS investments and a significant drop in the Fund's net asset values.  Specifically, defendant Kelsoe reported that:

During the six months ended September 30, 2007, RMK High Income Fund, Inc. (the "Fund") had a total return of (37.29)%, based on market price and reinvested dividends, and the Fund had a total return of (37.70)%, based on net asset value and reinvested dividends. During the same period, the Lehman Brothers Ba U.S. High Yield Index(1) had a total return of 0.74%. The Fund paid total distributions from net investment income of $0.82 per share during the six-month period.

The turmoil in the mortgage market that began in December 2006 and the credit crunch that began during the Fund's first fiscal quarter has continued to plague the performance of both the Fund's net asset value and market valuation. Although below investment grade corporate debt has held up reasonably well, any asset related to residential real estate has been materially devalued. This is especially true for mortgage-backed securities and collateralized debt obligations.

The market's appetite for credit sensitive assets has totally reversed course from the prevailing environment of 2006. A massive unwind of leverage has literally evaporated market liquidity in all structured finance assets and put selling pressure on virtually all credit-sensitive assets. Although this has been a sector of the fixed income markets that has provided very satisfying results in past periods, 2007 has proven to be much more difficult than we could have anticipated.

At any available opportunity, we are attempting to reposition the Fund's portfolio with a preference for safer, more liquid assets in order to create some stability in the Fund's net asset value and to provide as much income as possible. Certainly this type of market chaos provides ample opportunities to capture value for future

16

periods; however, given the extreme illiquidity and volatility of credit-sensitive assets, we expect to favor corporate assets and somewhat straightforward structures until the credit markets begin to gain some sustained stability. We expect more rate cuts by the Federal Open Market Committee in the fourth calendar quarter of 2007 and during 2008, which we anticipate will have a positive impact on liquidity and valuations of credit-sensitive assets.

52.     By Defendants' own admission, as of March 31, 2008 the Fund held $82 million in assets, representing a severe decline from the $303 million in assets on March 31, 2007, only a year earlier.

53.     The extreme losses in the Fund were noted in several news articles.  For example, Andy Meek of *The Daily News* stated that the Fund found itself "more bloodied than almost all of [its] rivals."

54.     As Defendants slowly disclosed the true condition of the Fund, the market price of the Fund's shares declined dramatically, from approximately $80 per share to below $10 per share, as demonstrated below:



55.     MAM's advisory fees were based on the assets held by the Fund, and therefore,

MAM was overcompensated based on the Fund's improperly inflated asset values.

56.     Through their positions of authority over the Fund, Defendants knew that they were required to disclose truthful, accurate and timely information to the Fund's shareholders and not to conceal the true financial condition of the Fund.  However, Defendants knowingly concealed from shareholders the Fund's excessive concentration in and severe losses in risky illiquid securities by, among other things, filing misleading quarterly and annual reports that failed to disclose the true "fair values" of the Fund's risky illiquid securities, e.g. Form N-Qs filed with the SEC on February 28, 2007 and August 29, 2007 and Form N-CSR filed with the SEC on June 6, 2007.

57.     As a direct and proximate result of Defendants' breaches of fiduciary duties, the Fund has sustained significant damages, including, but not limited to, significant losses of value and the excessive advisory fees paid to MAM.

## DERIVATIVE AND DEMAND ALLEGATIONS

58.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Fund to redress Defendants' breaches of fiduciary duties, unjust enrichment and other violations of law.

60.     Plaintiff is a shareholder of Nominal Defendant Helios High, was a shareholder of the Fund at the time of the wrongdoing alleged herein, and has been a shareholder of the Fund continuously since that time.

61.     Plaintiff will adequately and fairly represent the interests of the Fund and its shareholders in enforcing and prosecuting its rights.

62.     On November 23, 2009, more than 90 days ago, Plaintiff respectively made a demand (the "Demand") on the Board to commence an action against Defendants.  A copy of the Demand is attached hereto as Exhibit A.

63.     On January 12, 2010, John J. Feeny, Jr. ("Feeny"), the current President of the Fund, wrote a letter to Plaintiff's counsel acknowledging Plaintiff's Demand pertaining to the Fund, as well as additional demands pertaining to other Helios funds, and stating that:

> [I]n the course of related pending derivative litigation involving the former directors and/or officers and the former investment advisor of the Funds, the current Boards of Directors of the Funds are conducting an investigation to determine whether the Boards of Directors of the Funds should take action against the Funds' former directors, officers or investment advisor with respect to similar allegations.

64.     It is clear from Feeny's January 12, 2010 letter that the Board has not conducted, and does not intend to conduct, *any investigation whatsoever* regarding Plaintiff's Demand. Indeed, while Plaintiff is aware of "pending derivative litigation involving the former directors and/or officers and the former investment advisor of" *certain* Helios funds, including Helios Multi-Sector Fund, which litigation is reported in the Fund's SEC filings, e.g., the Fund's semi-annual shareholder report on Form N-CSRS filed with the SEC on December 2, 2009 ("the December 2009 Semi-Annual Report"), Plaintiff is unaware of *any* "pending derivative litigation involving the former directors and/or officers and the former investment advisor of" Helios High. In fact, the Fund's SEC filings, e.g., the December 2009 Semi-Annual Report, disclose *no* "pending derivative litigation" involving the Fund.  Consequently, it is clear that the Board has done, and apparently intends to do, *nothing whatsoever* to investigate Plaintiff's Demand with respect to the Fund, which is not, and cannot be, a good faith response to the Demand.

65.     Furthermore, the "investigation" that the Board is purportedly conducting with regard to certain other Helios funds has been going on for more than a year, with no end in sight.

Hence, even if this purported "investigation" included the Fund, which it clearly does not, the Board has had more than a reasonable amount of time "to determine whether the Boards of Directors of the Funds should take action against the Funds' former directors, officers or investment advisor with respect to similar allegations," yet it has failed to do so.  The Board's never-ending "investigation" regarding other Helios funds is merely a pretense for doing nothing, and thus is not, and cannot be, a good faith response to Plaintiff's Demand.

### COUNT I

**Against Defendants for Breach of Fiduciary Duties of Loyalty and Good Faith**

66.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.     As alleged herein in detail, Defendants owed the Fund the fiduciary duties of good faith and loyalty.

68.     Defendants breached their fiduciary duties of good faith and loyalty, as alleged herein.

69.     As a direct and proximate result of their breaches of fiduciary duties, the Fund has sustained damages, as alleged herein.

### COUNT II

**Against Defendant MAM for Violation of
Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b)**

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b) ("Section 36(b)"), "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments

of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

72.     MAM was the investment adviser of the Fund, a registered investment company, and thus is "deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by" the Fund.

73.     MAM breached its fiduciary duty in respect of such compensation or payments paid by the Fund, as alleged herein.

74.     As a direct and proximate result of its breach of fiduciary duties, MAM received excessive fees, which the Fund is entitled to recover pursuant to Section 36(b).

## COUNT III

### Against Defendant MAM For Unjust Enrichment

75.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.     MAM was unjustly enriched by its receipt of excessive fees based on improperly inflated asset values, as alleged herein, and it would be unconscionable to allow it to retain the benefits thereof.

77.     To remedy MAM's unjust enrichment the Court should order MAM to disgorge to the Fund the excessive fees it received.

WHEREFORE, Plaintiff demands judgment as follows:

    a.     Awarding the Fund the amount of damages sustained by the Fund as a result of Defendants' breaches of fiduciary duties;

    b.     Ordering defendant MAM to disgorge to the Fund the excessive fees it received;

    c.     Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

      d.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs, and expenses; and

      e.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 18, 2010               Respectfully submitted,

                           **BRAMLETT LAW OFFICES**
                           **By:**

                           ***s/Paul Kent Bramlett***
                           **PAUL KENT BRAMLETT   TN#7387**

Paul Kent Bramlett  TN #7387/MS #4291
Robert Preston Bramlett  TN #25895
**BRAMLETT LAW OFFICES**
2400 Crestmoor Road
P. O. Box 150734
Nashville, TN  37215
Telephone:     (615) 248-2828
Facsimile:     (615) 254-4116
E-mail :      pknashlaw@aol.com
               Robert@BramlettLawOffices.com

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Phone: (610) 667-7706
Fax: (267) 948-2512

*Attorneys for Plaintiff*

## VERIFICATION

I, Cecil Cannaday, hereby verify that I have authorized the filing of the attached Verified

Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein

are true and correct to the best of my knowledge, information and belief.

I declare under penalty that the foregoing is true and correct.

DATE: _3-4-2010_

_____
Cecil Cannaday