## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION AT MEMPHIS

|  |  |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION | Case No. 10-2188-SHM |
|  | **Jury Demand** |
| This Document Relates to: | |
| *In re Helios Closed-End Funds Derivative Litigation*, No. 2:10-cv-02188-SHM-dkv | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiffs Cecil Cannaday ("Cannaday") and Ronald Godfrey ("Godfrey") (collectively, "Plaintiffs"), by the undersigned attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiffs' counsel, as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought for the benefit of nominal defendants Helios Advantage Income Fund, Inc. ("Helios Advantage"), Helios High Income Fund, Inc. ("Helios High"), Helios Multi-Sector High Income Fund, Inc. ("Helios Multi-Sector") and Helios Strategic Income Fund, Inc. ("Helios Strategic") (collectively, the "Funds")[1] against certain of its former officers and directors and its former investment advisor, Morgan Asset Management, Inc. ("MAM"), seeking to remedy their breaches of fiduciary duties, unjust enrichment, and other violations of law.

2.     The Funds filed with the U.S. Securities and Exchange Commission ("SEC") on

---

[1] The Funds were formerly known as Regions Morgan Keegan or RMK.

Form N-2 and Form N-2As and disseminated to investors Registration Statements and amended Registration Statements.   Subsequently, the Funds filed with the SEC Prospectuses (the "Prospectuses"), which explicitly incorporated by reference Statements of Additional Information ("SAIs") attached thereto and all other exhibits (collectively, the "Offering Materials").

3.      In the Offering Materials, the Funds touted the diversification of their portfolios. Specifically, the Prospectuses described the Funds as ***diversified***, closed-end management investment funds.  Pursuant to the Prospectuses, the investment objective of the Funds included "investing a majority of its total assets in a ***diversified*** portfolio of below investment grade debt securities offering attractive yield and capital appreciation potential."

4.      The Funds' Offering Materials included the Funds' investment strategy and policies and provided explicit limitations and restrictions on investments, which could only be modified after full disclosure and with shareholder approval.

5.      As known by Defendants (as defined herein), the Offering Materials established the limitation that they would not concentrate more than 25% of the Funds' assets in the same industry.  The Offering Materials stated that the Funds would remain fully diversified and not concentrated in any particular industry, and that this policy could only be changed through a vote of a majority of the Funds' outstanding shares.

6.      Defendants knowingly caused the Funds to invest heavily in Asset-Backed Securities ("ABS"), Mortgage-Backed Securities ("MBS"), Collateralized Debt Obligations ("CDO") and other illiquid securities beyond the 25% cap in clear violation of the Funds' stated policies.

7.      As a result, the Funds were no longer the low-risk, diversified bond funds they

claimed to be, causing the Funds' financial statements from 2006 to 2008 to be false and misleading.

8.      In breach of their fiduciary duties, Defendants knowingly: (a) caused the Funds to invest heavily in ABSs, MBSs, CDOs and other illiquid securities; (b) concentrated more than 25% of the Funds' assets in one industry; (c) failed to disclose to the Funds' shareholders the true extent of the Funds' exposure to these securities and the risks associated therewith; and (d) overstated the values of the ABSs, MBSs, CDOs and other illiquid and subprime securities the Funds held, thereby overstating the Funds' net asset values ("NAV").[2]

9.      On April 7, 2010, the SEC initiated administrative proceedings against defendants Kelsoe, J. Thompson Weller, MAM and Morgan Keegan & Co., Inc. ("Morgan Keegan"), a registered broker/dealer that exclusively distributed shares of the Funds.  Specifically, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings pursuant to certain securities laws and SEC regulations (the "SEC Order").

10.     On the same date, the Financial Industry Regulatory Authority ("FINRA") also filed a complaint against Morgan Keegan (the "FINRA Complaint"), and securities regulators in Alabama, Kentucky, Mississippi and South Carolina initiated administrative proceedings against MAM, Morgan Keegan and certain other defendants.

11.     As a result of Defendants' breaches of fiduciary duties, the Funds have suffered severe losses in value and have paid MAM excessive management fees, as alleged in detail herein.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that

---

[2] NAV represents a fund's per share market value and is derived by dividing the total value of all the cash and securities in a fund's portfolio, less any liabilities, by the number of shares outstanding.

this Complaint states a federal question.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

13.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14.    Plaintiff Cannaday is a shareholder of Helios Advantage, Helios High and Helios Strategic, was a shareholder of these funds at the time of the wrongdoing alleged herein, and has been a shareholder of these funds continuously since that time.  Cannaday is a citizen of the State of Arkansas.

15.    Plaintiff Godfrey is a shareholder of Helios Advantage, Helios Multi-Sector and Helios Strategic, was a shareholder of these funds at the time of the wrongdoing alleged herein, and has been a shareholder of these funds continuously since that time.  Godfrey is a citizen of the State of Washington.

16.    Nominal Defendants Helios Advantage, Helios High, Helios Multi-Sector and Helios Strategic are closed-end management investment companies incorporated in Maryland with their principal executive offices located at Three World Financial Center, 200 Vesey Street,

10th Floor, New York, New York 10281-1010.

17.     Defendant James C. Kelsoe, Jr. ("Kelsoe") served as a Senior Portfolio Manager for the Funds from 2004 through July 2008.  Upon information and belief, defendant Kelsoe is a citizen of the State of Tennessee.

18.     Defendant J. Kenneth Alderman ("Alderman") served as Chairman of the Funds' Board of Directors (the "Board") from 2006 through 2008 and as director of the Funds from 2004 through July 2008.  Upon information and belief, defendant Alderman is a citizen of the State of Alabama.

19.     Defendant Carter E. Anthony ("Anthony") served as President and director of the Funds from 2004 through 2006.  Upon information and belief, defendant Anthony is a citizen of the State of Alabama.

20.     Defendant Jack R. Blair ("Blair") served as a director of the Funds from 2005 through July 2008.  Upon information and belief, defendant Blair is a citizen of the State of Tennessee.

21.     Defendant Thomas R. Gamble ("Gamble") served as a Vice President and director of the Funds from 2003 through July 2008.  Upon information and belief, defendant Gamble is a citizen of the State of Alabama.

22.     Defendant Albert C. Johnson ("Johnson") served as a director of the Funds from 2005 through 2009.  Upon information and belief, defendant Johnson is a citizen of the State of Alabama.

23.     Defendant Charles D. Maxwell ("Maxwell") served as a director of the Funds from 2003 through 2008 and also served as Secretary and Assistant Treasurer of the Board from 2003 through 2008.   Upon information and belief, defendant Maxwell is a citizen of the

Commonwealth of Virginia.

24.    Defendant James S.R. McFadden ("McFadden") served as a director of the Funds from 2004 through 2008.  Upon information and belief, defendant McFadden is a citizen of the State of Tennessee.

25.    Defendant Allen B. Morgan, Jr. ("Morgan") served as Chairman of the Board and director of the Funds from 2004 through 2006.  Upon information and belief, defendant Morgan is a citizen of the State of Tennessee.

26.    Defendant W. Randall Pittman ("Pittman") served as a director of the Funds from 2004 through 2008.  Upon information and belief, defendant Pittman is a citizen of the State of Alabama.

27.    Defendant Mary S. Stone ("Stone") served as a director of the Funds from 2003 through 2008.  Upon information and belief, defendant Stone is a citizen of the State of Alabama.

28.    Defendant Brian B. Sullivan ("Sullivan") served as President and director of the Funds from 2006 through 2008.  Upon information and belief, defendant Sullivan is a citizen of the State of Alabama.

29.    Defendant David H. Tannehill ("Tannehill") served as Assistant Portfolio Manager of the Funds from 2006 through 2008.  Upon information and belief, defendant Tannehill is a citizen of the State of Tennessee.

30.    Defendant Joseph C. Weller ("Joseph Weller") served as Treasurer and director of the Funds from 2004 through 2006.  Upon information and belief, defendant Weller is a citizen of the State of Tennessee.

31.    Defendant J. Thompson Weller ("Thompson Weller") served as Treasurer of the

Funds from 2006 through 2008 and as Assistant Secretary and director of the Funds from 2003 through 2008.  Upon information and belief, defendant Thompson Weller is a citizen of the State of Tennessee.

33.    Defendant Archie W. Willis, III ("Willis") served as a director of the Funds from 2003 through 2008.  Upon information and belief, defendant Willis is a citizen of the State of Tennessee.

33.    Defendant Michele F. Wood ("Wood") served as Chief Compliance Officer and director of the Funds from 2006 through 2008.  Upon information and belief, defendant Wood is a citizen of the State of Tennessee.

34.    Defendant MAM is incorporated in Tennessee with its principal executive offices located at Fifty North Front Street, Memphis, Tennessee 38103 and describes itself as an active investment manager.  MAM served as the Funds' investment adviser until August 2007.

35.    Collectively, defendants Kelsoe, Alderman, Anthony, Blair, Gamble, Johnson, Maxwell, McFadden, Morgan, Pittman, Stone, Sullivan, Tannehill, Joseph Weller, Thompson Weller, Willis and Wood are herein referred to as the "Individual Defendants."  The Individual Defendants and MAM are herein referred to as "Defendants."

## DUTIES OF THE DEFENDANTS

36.    By reason of their positions as officers and/or directors of the Funds and because of their ability to control the business and corporate affairs of the Funds, the Individual Defendants owed the Funds and their shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Funds in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Funds and their shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each

director and officer of the Funds owes to the Funds and their shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Funds and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Funds, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38. To discharge their duties, the officers and directors of the Funds were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Funds. By virtue of such duties, the officers and directors of the Funds were required to, among other things:

     a. exercise good faith in ensuring that the affairs of the Funds were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Funds;

     b. exercise good faith in ensuring that the Funds were operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements; and

     c. when put on notice of problems with the Funds' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

39. The Code of Ethics for Principal Executive and Principal Financial Officers of the Funds states that:

**Disclosure & Compliance**

- Each Covered Officer should familiarize himself with the disclosure requirements generally applicable to the Fund;

- Each Covered Officer should not knowingly misrepresent, or cause others to misrepresent, facts about the Fund to others, whether within or outside the Fund, including to the Fund's directors/trustees and auditors, and to governmental regulators and self-regulatory organizations;

- Each Covered Officer should, to the extent appropriate within his area of responsibility, consult with other officers and employees of the Fund and the Fund's adviser or any sub-adviser with the goal of promoting full, fair, accurate, timely and understandable disclosure in the reports and documents the Fund files with, or submit to, the SEC and in other public communications made by the Fund; and

- It is the responsibility of each Covered Officer to promote compliance with the standards and restrictions imposed by applicable laws, rules and regulations.

40.     As the Funds' advisor, MAM likewise owed to the Funds the fiduciary duties of good faith, trust, loyalty and due care.

## SUBSTANTIVE ALLEGATIONS

### Background of the Funds

41.     On or about September 7, 2004, Helios Advantage filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about October 20, 2004 and November 11, 2004, Helios Advantage filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on November 10, 2004, Helios Advantage filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios Advantage Prospectus").  The Helios Advantage Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

42.     The Helios Advantage Prospectus sets forth the investment strategy of the fund, stating: "The Fund will seek to achieve its investment objectives by investing a majority of its total assets in below investment grade debt securities offering attractive yield and capital appreciation potential.  The Fund also may invest up to 15% of its total assets in foreign debt and equity securities and up to 25% of its total assets in domestic equity securities, including common and preferred stocks.  The Fund will invest in a wide range of below investment grade debt securities, including corporate bonds, mortgage- and asset-backed securities and municipal

and foreign government obligations, as well as securities of companies in bankruptcy reorganization proceedings or otherwise in the process of debt restructuring."

43.     On or about April 16, 2003, Helios High filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about May 28, 2003 and June 23, 2003, Helios High filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on June 26, 2003, Helios High filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios High Prospectus").  The Helios High Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

44.     The Helios High Prospectus set forth the investment strategy of the fund, stating: "The Fund will seek to achieve its investment objectives by investing a majority of its total assets in a diversified portfolio of below investment grade debt securities offering attractive yield and capital appreciation potential."

45.     On or about November 14, 2005, Helios Multi-Sector filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about January 9, 2006 and January 18, 2006, Helios Multi-Sector filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on January 23, 2006, Helios Multi-Sector filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios Multi-Sector Prospectus").  The Helios Multi-Sector Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

46.     The Helios Multi-Sector Prospectus set forth the investment strategy of the fund, stating: "The Fund will seek to achieve its investment objectives by investing in a diversified portfolio consisting primarily of debt securities that the Adviser believes offer attractive yield

-10-

and capital appreciation potential."

47.     On or about January 1, 2004, Helios Strategic filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about February 26, 2004 and March 17, 2004, Helios Strategic filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on March 22, 2004, Helios Strategic filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios Strategic Prospectus").  The Helios Strategic Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

48.     The Helios Strategic Prospectus sets forth the investment strategy of the fund, stating: "The Fund will seek to achieve its investment objectives by investing in a diversified portfolio of securities that offers attractive yield and capital appreciation potential and consists primarily of debt securities and secondarily of equity securities."

49.     The Prospectuses also describe the management of the Funds.  Specifically, the Funds' Board provides broad supervision over the affairs of the Funds, including supervision of the duties performed by MAM.  The officers of the Funds are responsible for the Funds' operations.

50.     Furthermore, MAM provides the Funds with investment research and advice and furnishes the Funds with investment programs consistent with the Funds' respective investment objectives and policies, *subject to the supervision of the Funds' Board*.  MAM determines which portfolio securities will be purchased or sold, arranges for the placing of orders for the purchase or sale of portfolio securities, selects brokers or dealers to place those orders, maintains books and records with respect to the Funds' securities transactions and reports to the Board on the Funds' investments and performance.  However, the day-to-day management of the Funds'

portfolios is the responsibility of a team led by Kelsoe.

51.     As stated in the Prospectuses, under the advisory agreement, the Funds will pay to MAM monthly, as compensation for the services rendered and expenses paid by it, a fee equal on an annual basis to 0.65% of the Funds' average daily Managed Assets.  Under the administration agreement, the Funds will pay to MAM monthly, as compensation for the services rendered and expenses paid by it, a fee equal on an annual basis to 0.15% of the Funds' average daily Managed Assets.  Pursuant to the Prospectuses, "Managed Assets" is defined as the Funds' average daily total assets (including any assets attributable to any leverage) minus the sum of accrued liabilities other than debt entered into for purposes of leverage.

52.     The Prospectuses also state that, under the supervision of the Board, MAM determines the liquidity of the Funds' investments and, through reports from MAM, the Board monitors investments in illiquid instruments.  It further describes how the Funds value illiquid investments such as sub-prime loans, which are investments that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued, namely, that in the absence of market quotations, illiquid investments are priced at fair value *as determined in good faith by a committee appointed by the Board*.

### Defendants' Overconcentration in MBSs

53.     Each of the Funds' Prospectuses provides investment limitations that may not be changed without the approval of the holders of a majority of the respective Funds' outstanding voting securities.  The corresponding SAIs explicitly stated that the Funds may not "purchase the securities of any issuer (other than securities issued or guaranteed by the U.S. government or any of its agencies or instrumentalities) if, as a result, 25% or more of the Fund[s'] total assets would be invested in the securities of companies the principal business activities of which are in the same industry."

54.     However, ***beginning in 2007***, without shareholder approval, Defendants knowingly caused or allowed all of the Funds to become overly concentrated in risky illiquid securities, including MBSs, ABSs and subprime securities and to invest more than 25% of their assets in the same industry.  Moreover, Defendants knowingly caused or allowed the Funds to materially misrepresent their financial condition and performance by failing to disclose the full extent of the Funds' losses on their investments in these risky illiquid securities.

55.     For example, Defendants knowingly caused or allowed the Funds to invest heavily in CDOs, which are a type of structured ABSs whose value and payments are derived from a portfolio of fixed-income underlying assets.  As of June 30, 2006, Helios Advantage invested 12.8% of its assets in CDOs, Helios High invested 12.9%, Helios Multi-Sector invested 10.9%, and Helios Strategic invested 12.9%.  However, as of June 30, 2007, just one year later, each of the Funds had increased its investment in CDOs by ***almost three times***.  Specifically, by June 30, 2007, Helios Advantage invested 34.4% of its assets in CDOs, Helios High invested 37.8%, Helios Multi-Sector invested 31.6%, and Helios Strategic invested 37.8%.

56.     In addition, as known by Defendants, as of December 31, 2007, each of the Funds invested more than 25% of its assets in MBSs.  Specifically, Helios Advantage invested 31.2% of its assets in MBSs, Helios High invested 27%, Helios Multi-Sector invested 32%, and Helios Strategic invested 30.9%.  The foregoing overconcentrations in CDOs and MBSs are in clear violation of the Funds' 25% limitation on concentration of investments.

57.     Furthermore, as stated in the FINRA Complaint, Morgan Keegan failed, in any 2007 sales materials related to any of the Funds, to disclose the problems in the MBS market or disclose that a substantial portion of the Funds' portfolios were acutely affected by then-current economic conditions.

58.    By early 2007, Defendants were well aware that the Funds were experiencing severe difficulties related to turmoil in the MBS market.  Pursuant to the FINRA Complaint, in firm-wide conference calls in February and March 2007, Kelsoe told several Morgan Keegan brokers that the Funds had invested in the subprime market and that NAVs were probably going to be hurt.  By early April 2007, Kelsoe reported that stress in the market had spread to other areas, and that he was concerned and alarmed about the Funds' NAVs.  In mid-July 2007, he warned that "anything that is in structured finance region is now in a real credit vacuum."

59.    Despite their knowledge regarding the MBS market, Defendants failed to disclose the Funds' overconcentration in MBSs and the extent of the risks and losses to the Funds.

**Defendants' Dissemination of False and Misleading Statements**

60.    Defendants knowingly caused or allowed the Funds to issue false and misleading financial reports on Forms N-CSR and N-Q in order to conceal their illicit practices.   In particular, Defendants caused the Funds to invest heavily in risky MBSs, surpassing the 25% cap in violation of the Funds' policies, and the Funds' SEC filings failed to disclose the full extent of the risks associated with overconcentration in MBSs and other illiquid securities.  Furthermore, the Funds' financial statements were false and misleading because they concealed the true extent of the losses to the Funds, as the Funds' NAVs were artificially inflated and did not reflect "fair market value."

61.    Indeed, according to the SEC Order, Kelsoe and MAM made fraudulent misrepresentations and omissions of material facts directly to the Funds' investors concerning the Funds' performance.  As known by Defendants, the Funds' SEC filings did not disclose the improper practices in connection with the Funds.

62.    Moreover, according to the FINRA Complaint, MAM and Morgan Keegan issued false and misleading sales materials from January 1, 2006 through December 31, 2007.  They

also made false and misleading statements in direct response to customer and broker inquiries, which downplayed the risks and effects of market conditions on the Funds.  For example, MAM's Director of Marketing, Courtney H. Nash ("Nash"), responded to inquiries with the following reassurances:

- After expressing confidence in Helios Strategic and optimism going forward, Nash concluded, "In [Kelsoe's] and my opinion, this is an excellent buying opportunity." (March 16, 2007)

- "Nothing specific going on with the portfolio or the income that it produces that would dictate such a sell off.  Purely, supply and demand."  (June 14, 2007; regarding all of the Funds)

- "The volatility in the closed end funds is strictly based on supply and demand."  (July 2, 2007)

- In response to a question from a financial advisor, Nash stated, "I assume we are to stay the course with our clients . . . . I think so.  A long term objective should not be forgotten, over a 10 or 15 year period clients will have more in the way of total return in our fund than others because of the high level of income generated."  (July 3, 2007)

- In response to a question from a financial advisor, Nash stated, "[Kelsoe] thinks we may be close to the end of re-pricing, but who knows about the bottom for the market prices.  I think the market is driving the price in anticipation of a dividend cut, that at this time we don't feel is necessary . . . so I think this is a buying opportunity.  We are posting a Q&A with [Kelsoe] on the website, hopefully by tomorrow . . . . I think this will do a good job of calming the fears."  (July 16, 2007)

63.    The following SEC filings were also false and misleading when made.

64.     On June 7, 2006, the Funds filed a Certified Shareholder Report on Form N-CSR

with the SEC that provided the following Management Discussion of Fund Performance signed

by Kelsoe regarding each of the Funds:

> In spite of a modest level of industry-wide outflows from corporate high yield
> funds, the high yield corporate market feels pretty good so far this year. **With little
> change to underlying asset value, index performance has remained at coupon
> clipping levels (i.e. prices have held up).** Importantly, economic conditions
> continue to remain strong causing the Fed to nudge interest rates ever higher. A
> strong economy is very good for corporate earnings, cash flows, balance sheets,
> equity valuations, and, in turn, high yield corporate bonds. Such conditions create
> more opportunities for corporate bond issuers to refinance or otherwise payoff
> their bonds, effectively placing an underlying bid for the bonds. In other words,
> steady bond prices. Unfortunately, strong bids create a scarcity of attractive
> investment opportunities and that is the challenge we face today. Opportunities
> exist in every market environment, they just may not be readily apparent.
>
> *      *      *
>
> In the asset-backed and mortgage-backed arena, market technicals have made a
> dramatic about face over the last six weeks. The market was very heavy during
> the fourth quarter of 2005 with very few buyers willing to commit to new
> positions at the close of a very difficult year. However, beginning in February the
> demand for "BBB" to "B" floating rate asset-backed bonds picked up
> dramatically. The prospect of continued rate hikes from the Federal Reserve and
> the lack of available yield in the fixed income market have forced investors into
> some of the more "off the run" issues that we have used effectively in the high
> income fund. We expect floating rate assets to continue to contribute to our net
> asset value stability and current yield during the next 3 to 6 months as short term
> rates push higher. Our challenge will be to find enough suitable fixed rate assets
> as this interest rate cycle nears the point where the Federal Reserve will begin
> lowering rates.

(emphasis added).

65.     The report further described each Fund's performance, as follows:

- For the six months and the year ended March 31, 2006, RMK
  Advantage Income Fund, Inc. had total returns of 7.35% and
  23.28%, respectively, based on market price and reinvested
  dividends. For the six months and the year ended March 31, 2006,
  the Fund had total returns of 5.80% and 11.05%, respectively,
  based on net asset value and reinvested dividends. For the six
  months and the year ended March 31, 2006, the Lehman Brothers
  Ba U.S. High Yield Index had total returns of 2.44% and 6.83%,

respectively. ***The Fund's strong performance was primarily due to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the relative net asset value stability produced by the Fund's allocation to a wide variety of asset types.*** The Fund had an above average yield due to three main factors: an efficient leverage package which allowed the Fund to have additional money invested with limited borrowing costs; an increasing interest rate environment and our overweighting in the floating rate securities sector; and a prospectus that gives the management team latitude to look at sectors that are not in the index. (emphasis added).

- For the six months and the year ended March 31, 2006, RMK High Income Fund, Inc. had total returns of 8.08% and 24.15%, respectively, based on market price and reinvested dividends. For the six months and the year ended March 31, 2006, the Fund had total returns of 3.90% and 7.80%, respectively, based on net asset value and reinvested dividends. For the six months and the year ended March 31, 2006, the Lehman Brothers Ba U.S. High Yield Index had total returns of 2.44% and 6.83%, respectively. ***The Fund's strong performance was primarily due to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the relative net asset value stability produced by the Fund's allocation to a wide variety of asset types.*** The Fund had an above average yield due to three main factors: an efficient leverage package which allowed the Fund to have additional money invested with limited borrowing costs; an increasing interest rate environment and our overweighting in the floating rate securities sector; and a prospectus that gives the management team latitude to look at sectors that are not in the index. (emphasis added).

- RMK Multi-Sector High Income Fund, Inc. began trading on January 19, 2006 under the ticker symbol RHY after an initial public offering at $15 per share. The Fund had a total return of 7.38% for the period ended March 31, 2006, based on market price and reinvested dividends. The Fund had a total return of 2.27% for the period ended March 31, 2006, based on net asset value and reinvested dividends. From January 19, 2006 until March 31, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 0.97%.

- For the six months and the year ended March 31, 2006, RMK Strategic Income Fund, Inc. had total returns of 7.11% and 22.60%, respectively, based on market price and reinvested dividends. For the six months and the year ended March 31, 2006, the Fund had total returns of 4.26% and 9.95%, respectively, based

-17-

on net asset value and reinvested dividends. For the six months and the year ended March 31, 2006, the Lehman Brothers Ba U.S. High Yield Index had total returns of 2.44% and 6.83%, respectively. ***The Fund's strong performance was primarily due to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the relative net asset value stability produced by the Fund's allocation to a wide variety of asset types.*** The Fund had an above average yield due to three main factors: an efficient leverage package which allowed the Fund to have additional money invested with limited borrowing costs; an increasing interest rate environment and our overweighting in the floating rate securities sector; and a prospectus that gives the management team latitude to look at sectors that are not in the index.  (emphasis added).

66.     On December 7, 2006, the Funds filed a Semi-Annual Certified Shareholder

Report on Form N-CSRS with the SEC that provided the following Management Discussion of

Fund Performance signed by Kelsoe regarding each of the Funds:

During the first six months of the 2007 fiscal year, corporate high yield debt and common stocks were the best performing asset categories. Credit spreads (the yield premium required for risky assets over riskless assets such as U.S. Treasuries) contracted, or shrank significantly in the corporate sector providing meaningful outperformance for corporate securities. ***In the asset-backed sector, however, concerns over the slow down in housing and real estate in general caused credit spreads to expand and acted to depress overall performance from our portfolio of mortgage related securities.*** Asset-backed bonds secured by aircraft leases, medical equipment leases and ship leases continued to perform very well.

(emphasis added).

67.     The report further described each Fund's performance, as follows:

- During the first half of RMK Advantage Income Fund, Inc.'s fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 11.19%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 3.06%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. ***The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*** (emphasis added).

-18-

- During the first half of RMK High Income Fund, Inc.'s fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 10.91%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 3.49%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. ***The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*** (emphasis added).

- During the first half of RMK Multi-Sector High Income Fund, Inc.'s fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 15.39%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 6.16%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. ***The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*** (emphasis added).

- During the first half of RMK Strategic Income Fund, Inc.'s fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 11.40%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 2.74%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. ***The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*** (emphasis added).

68.    On June 6, 2007, the Funds filed a Certified Shareholder Report on Form N-CSR with the SEC that provided the Management Discussion of Fund Performance signed by Kelsoe regarding each of the Funds.  The report finally acknowledged that the Funds' performance had been negatively impacted by the recent turmoil in the mortgage market but attempted to downplay the impact, stating in relevant part as follows:

Since our last report, the Fund[s'] market price share performance has been

-19-

negatively impacted by the reduction of the monthly distribution rate from $0.15 per share to $0.14 per share. The Fund[s'] performance has also been negatively impacted by the recent turmoil in the mortgage market. During the months leading up to the reduction of the Fund[s'] distribution rate, portfolio earnings were increasingly under pressure due to consistently rising costs associated with the leverage (borrowed money) employed by the Fund[s] and by a prolonged period of contracting credit spreads. The combination of these two market forces resulted in lower net earnings to the Fund[s] and required a reduction in the distribution rate beginning in December 2006.

Since December, the U.S. mortgage-backed securities market has undergone serious turmoil, most notably in the sub-prime home equity arena. ***While this downward volatility in the mortgage-backed arena has had a negative impact on the net asset value of the Fund[s], it has also provided an opportunity to buy assets at considerably higher yields than have been available for more than two years. Strategically redeploying assets during this market upheaval may be difficult from a net asset value perspective for a period of time, but this is also the best opportunity we have seen in years to secure better portfolio earnings for quarters to come.***

(emphasis added).

69.    The report further described each Fund's performance, as follows:

- For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of (8.52)% and 1.53%, respectively, based on market price and reinvested dividends and other distributions. For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of 3.24% and 6.21%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

- For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of (12.71)% and (3.26)%, respectively, based on market price and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Fund had a total return of 2.56% and 6.05%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

- For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of (3.84)% and 10.96%, respectively, based on market price and reinvested dividends and other distributions.

For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of 3.09% and 9.45%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

- For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of (11.06)% and (1.09)%, respectively, based on market price and reinvested dividends and other distributions. For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of 3.52% and 6.18%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

70.    The above SEC filings were false and misleading because they: (1) touted the diversification of the Funds' portfolios; (2) failed to disclose that Defendants invested heavily in MBSs, ABSs, and other illiquid risky securities; and (3) failed to disclose the true extent of the risks associated with such overconcentration and of the losses to the Funds.

71.    Furthermore, each of the foregoing SEC filings as well as the Funds' reports on Form N-Qs filed with the SEC on February 28, 2007 and August 29, 2007 reported the NAVs of the Funds in addition to the Funds' financial performances.  As Defendants failed to disclose, the Funds' NAVs were not properly written down and thus were inflated, as further detailed below.

**Defendants' Manipulation of the Funds' NAVs**

72.    In addition to their other misconduct, as alleged herein, Defendants knowingly failed to price the Funds' illiquid investments, including MBSs and CDOs, at "fair value."  As stated in the SEC Order, the Funds' Board was responsible for pricing the Funds' securities in accordance with the Funds' valuation policies and procedures.  By contract, the Board delegated its pricing responsibility to Morgan Keegan, which priced each portfolio's securities and calculated its daily NAV through the Fund Accounting Department ("Fund Accounting").

-21-

73.     Pursuant to the Prospectuses, the market price of illiquid securities generally is more volatile than that of more liquid securities, which may adversely affect the price that the Funds pay for or recover upon the sale of illiquid securities. Illiquid securities are also more difficult to value, and thus MAM's judgment plays a greater role in the valuation process.

74.     As stated in the Funds' Form N-Qs, investments for which market quotations are not readily available, or available quotations which appear to not accurately reflect the current value of an investment, are valued at fair value as determined in good faith by MAM's Valuation Committee using procedures established by and under the direction of the Funds' Board.

75.     Pursuant to the SEC Order, defendant Thompson Weller, Morgan Keegan's Controller and Head of Fund Accounting, served on the Valuation Committee that purportedly oversaw Fund Accounting's processes and evaluated the prices assigned to securities.

76.     The SEC Order described the Funds' valuation procedures: "The Funds' valuation procedures for fair-valued securities mandated that such securities should be valued in 'good faith' by the Valuation Committee, considering a series of general and specific factors including fundamental analytical data relating to the investment, an evaluation of the forces which influence the market in which the securities are purchased or sold and events affecting the security. The procedures, as set forth in the prospectus, required the Valuation Committee to maintain a written report documenting the manner in which the fair value of a security was determined and the accuracy of the valuation made based on the next reliable public price quotation for that security. The procedures also required that prices assigned to securities be periodically validated through, among other means, broker-dealer quotes." (internal quotations omitted).

77.     According to the SEC Order, the Funds' securities were not priced in accordance

with the Funds' valuation policies and procedures regarding valuation.  For example, Fund Accounting accepted unsubstantiated "price adjustments" submitted by Kelsoe that inaccurately inflated the prices of certain securities.  Fund Accounting further failed to document justifications for such pricing adjustments.  The SEC Order specifically stated that, between at least January 2007 and July 2007, Kelsoe had his assistant send approximately 262 purported price adjustments to Fund Accounting, many of which were "arbitrary and did not reflect fair value."

78.    Fund Accounting did not request, and Kelsoe did not supply, supporting documentation for his price adjustments.  As known by Kelsoe, his price adjustments were routinely entered into a spreadsheet used to calculate the NAVs of the Funds.

79.    Pursuant to the Funds' procedures, prices were often validated through broker-dealer quotes.  The SEC Order stated that the procedures specified that prices obtained from a broker-dealer could only be overridden when there was "a reasonable basis to believe that the price provided did not accurately reflect the fair value of the portfolio security."  Whenever a price was overridden, the procedures mandated the basis for overriding the price to be "documented and provided to the Valuation Committee for its review."

80.    In violation of the required procedures, Kelsoe actively screened and manipulated broker-dealer quotes.  After requesting broker-dealers quotes, Fund Accounting reviewed the quotes and determined if any prices varied from portfolio prices by more than five percent.  In cases where prices varied, Kelsoe decided on maintaining the current price or assigning the new price to the security.

81.    The SEC Order described other non-compliance with the Funds' policies and procedures: (i) "the Valuation Committee left pricing decisions to lower level employees in Fund

Accounting who did not have the training or qualifications to make fair value pricing determinations; (ii) Fund Accounting personnel relied on Kelsoe's 'price adjustments' to determine the prices assigned to portfolio assets, without obtaining any basis for or documentation supporting the price adjustments or applying the factors set forth in the procedures; (iii) Fund Accounting personnel gave Kelsoe excessive discretion in validating the prices of portfolio securities by allowing him to determine which dealer quotes to use and which to ignore, without obtaining documentation to support his adjustments; and (iv) the Valuation Committee and Fund Accounting did not ensure that the fair value prices assigned to many of the portfolio securities were periodically re-evaluated, allowing them to be carried at stale values for many months at a time."

82.    The SEC Order also stated that Thompson Weller "knew, or was highly reckless in not knowing, of the deficiencies in the implementation of valuation procedures set forth above, and did nothing to remedy them or otherwise to make sure fair-valued securities were accurately priced and the Funds' NAVs were accurately calculated."

83.    According to the SEC Order, the only pricing test regularly applied by the Valuation Committee was the "look back" test, which compared the sales price of any security sold by a Fund to the valuation of that security used in the NAV calculation for the five business days preceding the sale.  The test only covered securities after they were sold; thus, at any given time, the Valuation Committee never knew how many securities' prices could ultimately be validated by it.  Defendant Thompson Weller nevertheless signed the Funds' annual and semi-annual financial reports on Forms N-CSR, filed with the SEC.

84.    Furthermore, in evaluating the NAVs of the Funds, Defendants knowingly excluded relevant and available information that clearly indicated that the stated values of the

Funds' assets were too high.  As early as the end of 2006, industry analysts recognized that subprime mortgage foreclosures were on the rise and predicted trouble in the mortgage market, which signaled enormous risks and potential losses to investors.

85.     As stated in the SEC Order, Kelsoe forestalled declines in the NAVs of the Funds that would have occurred as a result of the deteriorating subprime market if the NAVs were accurately reported.

86.     As noted in an October 10, 2006 article in *Investor's Business Daily*, entitled "Risky New Loans Add Unknowns As Banks Size Up Housing Drop; Defaults likely will top rates in past downturns -- but by how much?," the number of mortgage foreclosures had increased dramatically.  For instance, "[f]or August [2006], foreclosures surged to 115,292 -- 24% higher than in July and 53% higher than a year earlier."  Moreover, the Mortgage Bankers Association's delinquency data cited a notable uptick in defaults among subprime loans, particularly those with adjustable rates.

87.     On December 19, 2006, the *Dow Jones International News* published an article, entitled "US Housing Policy Group Warns of Subprime Mortgage Foreclosures," stating in relevant part:

> U.S. subprime mortgage foreclosures may rise sharply in the years ahead, with defaults expected for about 15% of the 14 million subprime home loans made in the 1998-2006 period, according to a new forecast from a home finance advocacy group.

> "As this year ends, 2.2 million households in the subprime market either have lost their homes to foreclosure or hold subprime mortgages that will fail over the next several years," according to a study released Tuesday by the Center for Responsible Lending. "These foreclosures will cost homeowners as much as $164 billion, primarily in lost home equity."

> Lenders typically offer subprime loans to borrowers with impaired credit, charging higher interest rates to compensate for higher credit risk.

> The Center for Responsible Lending found subprime mortgages today often

-25-

include particularly risky attributes such as adjustable rates that are especially low in the early years of repayment, then balloon much higher over time.

The CRL study projects that as housing prices cool, fewer delinquent borrowers will have the home equity to refinance or to sell to avoid foreclosure. For subprime loans made in the past two years, the eventual foreclosure rate will be about 19%, even higher than the rate of the past nine years, it says . . . .

88.     On December 19, 2006, *PR Newswire* also reported on the subprime mortgage crisis in an article entitled "Report Reveals 2.2 Million Borrowers Face Foreclosure on Subprime Home Loans; Billions of Home Ownership Wealth to be Lost by Minority Americans; Chart Contains Detailed MSA-Specific Projections of Home Foreclosure Impacts," stating in relevant part:

A new Center for Responsible Lending (CRL) study reveals that 2.2 million American households will lose their homes and as much as $164 billion due to foreclosures in the subprime mortgage market. Titled, "Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners," the CRL study is the first comprehensive, nationwide review of millions of subprime mortgages originated from 1998 through the third quarter of 2006.

CRL's research suggests that risky lending practices have triggered the worst foreclosure crisis in the modern mortgage market, projecting that one out of five (19.4%) subprime loans issued during 2005-2006 will fail.

"In the subprime sector, the most vulnerable borrowers are sold the most dangerous loans," said Mike Calhoun, CRL president. "At $164 billion, the losses from foreclosures could pay for the college educations of four million kids. For families who lose their houses because their loans fail, savings and economic security will be way out of reach."

The report discusses a number of factors that drive subprime foreclosures -- in the majority of cases, borrowers receive high-risk loan features, packed into an adjustable rate mortgage with a low start rate, that is approved without considering whether the homeowner can afford to pay the loan after the rate rises.

Adjustable rate mortgages known as 2/28s (or "exploding ARMs") operate with an initial "teaser" rate for two years, followed by a steep payment increase. And, regardless of a borrower's credit history, the almost one-quarter of American families who get subprime loans find them crammed with other high-risk terms such as prepayment penalties, limited income documentation, and no escrow for property taxes and hazard insurance . . . .

-26-

89.     As noted in a January 26, 2007 *New York Times* article entitled "More People With Weak Credit Are Defaulting on Mortgages," investors in the subprime market continued to be impacted by the rising mortgage default rates:

> Wall Street's big bet on risky mortgages may be souring a lot faster than had been previously thought.
>
> The once booming market for home loans to people with weak credit -- known as subprime mortgages and made largely to minorities, the poor and first-time buyers stretching to afford a home -- is coming under greater pressure. *The evidence can be seen in rising default rates, increasingly strained finances at mortgage lenders and growing doubts among investors.*
>
> *Now, Wall Street firms, which had helped fuel the growth in the market by bankrolling and investing in subprime mortgage lenders, have begun to pinch off the money spigot.*
>
> Several mortgage lenders have recently collapsed. While the failures so far are small in number, some industry officials are concerned that they could be the first in a wave. The subprime sector, which produced loans worth more than $500 billion in the first nine months of last year, could shrink significantly.
>
> *A sharp contraction in subprime mortgages would have ripple effects, reducing consumers' access to credit and affecting investors like foreign central banks, pensions and mutual funds that have been big buyers of mortgage-backed securities.*
>
> *             *             *
>
> "Pick a company -- small, medium or large -- they all have the same problem: capital," said Marc A. Geredes, who runs a small mortgage company, LownHome Financial, in San Jose, Calif. "The economics of the business do not make sense right now."
>
> Wall Street firms were attracted to such lenders because they helped feed a pipeline of securities backed by the mortgages, a market bigger than the one for United States Treasury bonds and notes. Merrill Lynch, for example, securitized $67.8 billion in residential mortgages in the first nine months of 2006, up 58.4 percent from the period a year earlier.
>
> But an increasing number of borrowers are defaulting on subprime loans earlier now than they did a year ago, often within six months of having taken the loan out, shaking Wall Street's confidence in its subprime partners.
>
> In one indication that investors are losing their taste for mortgages, hedge funds that specialize in mortgage-backed securities had an outflow of $1.8 billion in

2006, down from an inflow of $1.8 billion in 2005, according to Hedge Fund Research. It was the only category of hedge funds to have a negative flow for the year.

"We have been and continue to be cautious about the subprime market -- its lending standards, decline in home price appreciation, other deteriorating credit fundamentals," said Jim Higgins, chief executive of Sorin Capital Management.

(emphasis added).

90.     Furthermore, as a result of the subprime mortgage crisis, in mid-2007, two Bear Stearns Co. hedge funds that were heavily invested in the subprime-mortgage market collapsed.

91.     Despite this material information clearly indicating that the values of the Funds' MBSs, ABSs and CDOs had declined dramatically, Defendants, in breach of their fiduciary duties and, with respect to the officers of the Funds, in breach of their duties pursuant to the Funds' Code of Ethics, knowingly and improperly delayed writing down the value of these investments and knowingly failed to disclose the true financial performance of the Funds to their shareholders.

92.     Furthermore, MAM's advisory fees were based on the assets held by the Funds, and therefore, MAM was overcompensated based on the Funds' improperly inflated asset values.

93.     Through their positions of authority over the Funds, Defendants knew that they were required to disclose truthful, accurate and timely information to the Funds' shareholders and not to conceal the true financial condition of the Funds.  However, Defendants knowingly concealed from shareholders the Funds' excessive concentration in and severe losses in risky illiquid securities by, among other things, filing misleading quarterly and annual reports that failed to disclose the true "fair values" of the Funds' risky illiquid securities.

94.     As a direct and proximate result of Defendants' breaches of fiduciary duties, the Funds have sustained significant damages, including, but not limited to, significant losses of value in the Funds and the excessive advisory fees paid to MAM.

## Revelation of Defendants' Misconduct

95.    On August 10, 2007, defendant Kelsoe wrote an open letter to investors

admitting, for the first time, that the Funds were having problems valuing their assets:

> I am careful to note the specific timing of this market commentary to provide
> appropriate context for my remarks given the dramatic market movements taking
> place hour to hour, and even moment to moment. Because the investment
> environment is changing so rapidly, I felt it appropriate to provide our
> shareholders with an update on the impact these conditions are having on the four
> RMK closed end funds, as well as the RMK Select High Income and Intermediate
> open end funds.
>
> One need only look at this morning's headlines to appreciate the global impact of
> this pervasive de-leveraging event we are now experiencing. What began as a
> credit event a few months ago mainly affecting sub-prime mortgages has quickly
> become an unprecedented liquidity issue for the broader financial markets.
>
> So why is this happening, and what is the impact on our closed end and open end
> funds? In my opinion, the de-leveraging, or sell-off of securities, by hedge funds
> and other financial institutions has created an excessive supply of all types of
> fixed income securities. This oversupply has pressured the balance sheets of all of
> Wall Street such that bid/offer spreads have widened and liquidity has
> dramatically declined over the last 30 to 60 days. Not only is supply higher than
> demand, but it exceeds the capacity to take these fixed income securities.
> Additionally, the rating agencies' sudden and drastic actions in downgrading
> securities have exacerbated these problems by triggering covenant violations and
> margin calls and creating even more supply in a very thin market.
>
> Just this week, we've learned that a number of mortgage companies are having
> major problems, including American Home Mortgage, C-Bass, Luminent
> Mortgage and, most recently, Home Bank. These are not sub-prime lenders, but
> they are still finding it difficult to get financing to originate loans. Their problems
> have a direct or indirect impact on the market for all mortgage securities due to
> their size in the loan origination and servicing arenas.
>
> At the annual shareholder meeting for our closed end funds just four weeks ago,
> we talked about the distinction between Net Asset Value (NAV) and market
> value. At that time, market values on all the funds had dropped to be more in line
> with the underlying NAV, or market value of the securities held in the portfolio.
> In the past few weeks there has been more volatility and downward pressure on
> the NAVs as a result of the difficulties in valuing these securities. Unlike stocks
> that trade openly on exchanges and whose value can easily be determined at any
> point of the day, mortgage-related securities and CDOs trade via individual bids
> and offers made on trading desks across Wall Street. As I mentioned earlier, the
> spreads between bid and offer prices continue to widen.

The lower valuations are no longer just showing up in the sub-prime mortgage securities as we have seen the pressure move further up the credit ladder to impact even AAA-rated bonds. Every fixed income security is subject to being devalued in this market, without regard to credit quality.  Even bonds which continue to meet their payment schedules are under pricing pressure now. Commercial and corporate credit are feeling the crunch, and it is even beginning to touch stock values.

As has been our practice with regard to the dividend, we will provide information to our board in the coming weeks in regard to the income expectations of the portfolios for the next few months. The board is scheduled to meet later this month to determine the dividend payout rate for the near term.

During my 20 year career, these are truly unprecedented times. Amidst these difficult circumstances, I assure you of my continuing commitment to do all that I can to take care of our shareholders' best interests.

96.    Then just four days later, on August 14, 2007, the Funds issued near identical

Form 8-Ks reporting that:

An independent valuation consultant has been retained to assist in determining the fair value of certain portfolio securities of [the Funds].  Recent instability in the markets for fixed income securities, particularly mortgage-backed and asset-backed securities, has made it more difficult to obtain realistic values for some of the Fund[s'] portfolio securities. In the absence of reliable market quotations, portfolio securities are valued by the Fund[s'] investment adviser at their "fair value" under procedures established and monitored by the Fund[s'] Board of Directors.  The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process.  Fair valuation procedures have been used to value a substantial portion of the assets of the Fund[s] with input from the valuation consultant and these valuations are reflected in the daily net asset value of the Fund[s'] shares.

97.    On semi-annual shareholder reports on Form N-CSRSs filed with the SEC on

December 5, 2007, the Funds disclosed the massive losses in the Funds' MBS and ABS

investments and a significant drop in the Funds' NAVs.  Specifically, defendant Kelsoe reported

that, during the six months ended September 30, 2007,

- Helios Advantage had a total return of (38.79)%, based on market price and reinvested dividends and had a total return of (37.96)%, based on net asset value and reinvested dividends. The fund paid total distributions from net investment income of $0.82 per share during the six-month period.

- Helios High had a total return of (37.29)%, based on market price and reinvested dividends and had a total return of (37.70)%, based on net asset value and reinvested dividends. The fund paid total distributions from net investment income of $0.82 per share during the six-month period.

- Helios Multi-Sector had a total return of (36.83)%, based on market price and reinvested dividends and had a total return of (41.82)%, based on net asset value and reinvested dividends. The fund paid total distributions from net investment income of $0.84 per share during the six-month period.

- Helios Strategic had a total return of (39.25)%, based on market price and reinvested dividends and other distributions and had a total return of (37.55)%, based on net asset value and reinvested dividends and other distributions. The fund paid total distributions of $0.82 per share during the six-month period, of which $0.81 per share is derived from net investment income and the remainder of the distribution, or $0.01 per share, is deemed a return of capital.

- Comparatively, the Lehman Brothers Ba U.S. High Yield Index(1) had a total return of 0.74%.

98.   The December 5, 2007 Form N-CSRSs further stated:

The turmoil in the mortgage market that began in December 2006 and the credit crunch that began during the Fund[s'] first fiscal quarter has continued to plague the performance of both the Fund[s'] net asset value and market valuation. Although below investment grade corporate debt has held up reasonably well, any asset related to residential real estate has been materially devalued. This is especially true for mortgage-backed securities and collateralized debt obligations.

The market's appetite for credit sensitive assets has totally reversed course from the prevailing environment of 2006. A massive unwind of leverage has literally evaporated market liquidity in all structured finance assets and put selling pressure on virtually all credit-sensitive assets. Although this has been a sector of the fixed income markets that has provided very satisfying results in past periods, 2007 has proven to be much more difficult than we could have anticipated.

At any available opportunity, we are attempting to reposition the Fund[s'] portfolio with a preference for safer, more liquid assets in order to create some stability in the Fund[s'] net asset value and to provide as much income as possible. Certainly this type of market chaos provides ample opportunities to capture value for future periods; however, given the extreme illiquidity and volatility of credit-sensitive assets, we expect to favor corporate assets and somewhat straightforward structures until the credit markets begin to gain some sustained stability. We expect more rate cuts by the Federal Open Market

Committee in the fourth calendar quarter of 2007 and during 2008, which we anticipate will have a positive impact on liquidity and valuations of credit-sensitive assets.

99.     The extreme losses in the Funds were noted in several news articles.   For example, Andy Meek of *The Daily News* stated that the Funds found themselves "more bloodied than almost all of [their] rivals."

100.    On June 10, 2010, the Funds issued a Form 8-K announcing, among other things, non-reliance on previously issued financial statements:

> If certain allegations in the [SEC] Order against the Respondents are found to be true at the conclusion of the Administrative Proceeding or otherwise, the financial statements and financial highlights for each Fund's four fiscal years ended March 31, 2009, March 31, 2008, March 31, 2007 and March 31, 2006 may be impacted. The Funds are currently undertaking an investigation of the underlying allegations in the Order. It is unclear at this time, however, whether each Fund's financial statements and financial highlights covering these fiscal periods are impacted and, if so, whether the impact is material.
>
> By correspondence dated May 27, 2010, PricewaterhouseCoopers LLP ("PwC"), the Funds' independent registered public accounting firm for the fiscal years ended March 31, 2008, 2007 and 2006, informed the Funds that PwC's audit reports dated May 29, 2008, May 21, 2007 and May 22, 2006, on the Funds' financial statements should no longer be relied upon. Certain of the Funds' authorized officers have discussed the matters disclosed in this filing with PwC.
>
> In addition, by correspondence dated May 28, 2010, BBD, LLP ("BBD"), the Funds' independent registered public accounting firm for the six-month period ended September 30, 2008 and the fiscal year ended March 31, 2009, informed the Funds that BBD's audit reports dated November 26, 2008 and May 28, 2009, on the Funds' financial statements should no longer be relied upon in view of PwC's May 27, 2010 correspondence regarding non-reliance on its previously issued audit reports because BBD relied upon PwC's audit report on the March 31, 2008 financial statements. The Funds' Audit Committees, Boards of Directors and authorized officers have discussed the matters disclosed in this filing with BBD.
>
> Based upon the actions of PwC and BBD, the financial statements and financial highlights covering these fiscal periods should not be relied upon until such time that the Funds' investigation of the underlying allegations in the Order has been completed and the issues surrounding the audit reports have been resolved.

101.    On August 25, 2010, in a current report on Form 8-K, the Funds released restated

financial statements for the fiscal year ended March 31, 2009.  The reductions in net assets for fiscal year 2008 were more than $10 million for Helios Advantage, $7.8 million for Helios High, $11 million for Helios Multi-Sector, and $8.7 million for Helios Strategic.

102.   As Defendants slowly disclosed the true condition of the Funds, each of the Funds' share prices declined dramatically, from approximately $80 per share to below $10 per share, as demonstrated below:









**Governmental Actions Against Certain Defendants**

103.   On April 7, 2010, the SEC charged MAM, Morgan Keegan, Kelsoe and
Thompson Weller with fraud related to subprime mortgages.   The SEC issued a press release
stating, in relevant part:

> The Securities and Exchange Commission today announced administrative
> proceedings against Memphis, Tenn.-based firms Morgan Keegan & Company
> and Morgan Asset Management and two employees accused of fraudulently
> overstating the value of securities backed by subprime mortgages.
>
> The SEC's Division of Enforcement alleges that Morgan Keegan failed to employ
> reasonable procedures to internally price the portfolio securities in five funds
> managed by Morgan Asset, and consequently did not calculate accurate "net asset
> values" (NAVs) for the funds. Morgan Keegan recklessly published these
> inaccurate daily NAVs, and sold shares to investors based on the inflated prices.
>
> ***"This scheme had two architects — a portfolio manager responsible for lies to
> investors about the true value of the assets in his funds, and a head of fund
> accounting who turned a blind eye to the fund's bogus valuation process," said
> Robert Khuzami, Director of the SEC's Division of Enforcement.***
>
> ***William Hicks, Associate Director in the SEC's Atlanta Regional Office, said,
> "This misconduct masked from investors the true impact of the subprime
> mortgage meltdown on these funds."***

According to the Commission's order instituting administrative proceedings, the SEC's Enforcement Division alleges that James C. Kelsoe, Jr., the portfolio manager of the funds and an employee of Morgan Asset and Morgan Keegan, arbitrarily instructed the firm's Fund Accounting department to make "price adjustments" that increased the fair values of certain portfolio securities. The price adjustments ignored lower values for those same securities quoted by various dealers as part of the pricing validation process. The Enforcement Division further alleges that Kelsoe actively screened and manipulated the pricing quotes obtained from at least one broker-dealer. With many of the funds' securities backed by subprime mortgages, Kelsoe's actions fraudulently prevented a reduction in the NAVs of the funds that otherwise should have occurred as a result of the deterioration in the subprime securities market.

The SEC's Division of Enforcement additionally alleges that Joseph Thompson Weller, a CPA who was head of the Fund Accounting Department and a member of the Valuation Committee, did nothing to remedy the deficiencies in Morgan Keegan's valuation procedures, nor did he otherwise make sure that fair-valued securities were being accurately priced and NAVs were being accurately calculated.

According to the SEC's order initiating proceedings, Morgan Keegan priced each portfolio's securities and calculated its daily NAV through its Fund Accounting Department. The NAV of an investment company is its total assets minus its total liabilities. An investment company calculates the NAV of a single share by dividing its NAV by the number of shares that are outstanding.

According to the SEC's order, each fund held various amounts of securities backed by subprime mortgages and lacked readily available market quotations. Therefore, the securities were internally priced using fair value methods to determine the amount that the funds would reasonably expect to receive on a current sale of the security. In SEC filings, the funds stated that the fair value of securities would be determined by a valuation committee using procedures adopted by the funds. In fact, the responsibility was essentially delegated to Morgan Keegan, which along with the valuation committee failed to comply with the funds' procedures in several ways.

The SEC's Division of Enforcement alleges that from at least January 2007 to July 2007, Kelsoe had his assistant send approximately 262 "price adjustments" to Fund Accounting. In many instances, these adjustments were arbitrary and did not reflect fair value. Despite the lack of any supporting documentation, Kelsoe's price adjustments were routinely entered into a spreadsheet used to calculate the NAVs of the funds. Kelsoe also routinely instructed Fund Accounting to ignore month-end quotes from broker-dealers that were supposed to be used to validate the prices the firm had assigned to the funds' securities.

104.    On the same date, FINRA filed a complaint against Morgan Keegan.  FINRA

issued a press release stating, in relevant part:

> The Financial Industry Regulatory Authority (FINRA) announced today that it has filed a complaint against Morgan Keegan & Company, Inc., charging the firm with marketing and selling seven affiliated bond funds to investors using false and misleading sales materials – costing investors well over $1 billion. In addition to an unspecified fine, FINRA is seeking disgorgement of all ill-gotten profits and full restitution for affected investors.
>
> From Jan. 1, 2006, through Dec. 31, 2007, Morgan Keegan sold over $2 billion of the bond funds. The funds were invested heavily in risky structured products – particularly, subordinated tranches of asset- and mortgage-backed securities, including sub-prime products. Those investments caused the funds to experience serious financial difficulties beginning in early 2007 and led to their collapse later that year.
>
> In its complaint, FINRA alleges that the misleading sales materials, combined with the firm's misleading and deficient internal guidance and failure to train its brokers about the risks, led Morgan Keegan's brokers to make material misrepresentations to investors. This was particularly acute with respect to one of the funds – the Regions Morgan Keegan Select Intermediate Bond Fund – which was marketed as a relatively safe and conservative fixed income mutual fund investment when, in fact, the fund was exposed to undisclosed risks associated with its investment in mortgage- and asset-backed securities and subordinated tranches of structured products.
>
> FINRA also alleges that, despite the negative impact on the bond funds in early 2007 – caused by the turmoil in the mortgage-backed securities market, most notably in the sub-prime home equity arena – Morgan Keegan failed, in any of its 2007 sales materials related to any of the bond funds, to disclose this to customers or that a substantial portion of the bond funds' portfolios were acutely affected by then-current economic conditions.
>
> In its complaint, FINRA further alleges that Morgan Keegan failed to establish, maintain and enforce an adequate supervisory system, including written supervisory procedures, reasonably designed to achieve compliance with federal securities laws and FINRA rules.
>
> Specifically, FINRA's complaint alleges that:
>
> - In its research, investment advice and performance updates to its brokers regarding the Intermediate Fund, Morgan Keegan failed to disclose the material characteristics and risks of investing in the fund, misstated the appropriate use of the fund and otherwise portrayed the fund as a safer investment than it was, even though the firm was aware of material, special risks that made the fund unsuitable for many retail investors.

-37-

- Morgan Keegan failed to ensure the accuracy of the advertising materials prepared by the fund manager and distributed by the firm, and failed to ensure that those materials disclosed all material risks, were not misleading and did not contain exaggerated claims.

- Morgan Keegan failed to train its brokers regarding the features, risks and suitability of the fund and, in its communications with its brokers, the firm failed to adequately describe the nature of the holdings and material risks of the Intermediate Fund.

- When Morgan Keegan became aware, beginning in early 2007, of the adverse market effects on the bond funds, the firm failed to timely warn its brokers or revise its advertising materials to reflect the disproportionately adverse effect the market was having on the performance of the securities that comprised the bond funds – which Morgan Keegan brokers continued to sell widely. At this time, the firm reassured, rather than warned, its sales force about the riskiness of the bond funds. As a result, some of the firm's brokers were unaware of the then-turbulent market's effects on the funds and failed to disclose the negative effects caused by market forces.

105.    Also on April 7, 2010, securities regulators in Alabama, Kentucky, Mississippi and South Carolina jointly filed an administrative action as the result of a multistate investigation of Morgan Keegan.  The state regulators accused MAM, Morgan Keegan and four individuals— Kelsoe, Sullivan, Wood and Gary Stringer (director of investments for the Wealth Management Services division of Morgan Keegan)—of fraud in connection with their management of the Funds and other bond funds.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

106.    The Funds' overconcentration in MBSs and other risky securities and violation of the Funds' policies were the direct result of the Individual Defendants' and MAM's breaches of fiduciary duties.

107.    As stated herein, Defendants breached their fiduciary duties by, among other things:

       a.    causing the Funds to invest heavily in ABSs, MBSs, CDOs and other risky

        securities;

    b.     failing to disclose the full extent of the risk associated with overconcentration in MBSs and ABSs and of the losses to the Funds;

    c.     violating the Funds' concentration policy by investing more than 25% of the Funds' assets in one industry;

    d.     manipulating the Funds' NAVs particularly in connection with their illiquid securities;

    e.     disseminating false and misleading statements that did not fully disclose the foregoing information; and

    f.     granting excessive compensation to MAM based on inflated financials.

108.    As a result of Defendants' breaches of fiduciary duties, the Funds have suffered severe losses in value and have paid MAM excessive management fees, as alleged in detail herein.

## DERIVATIVE AND DEMAND ALLEGATIONS

109.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

110.    Plaintiffs bring this action derivatively in the right and for the benefit of the Funds to redress Defendants' breaches of fiduciary duties, unjust enrichment and other violations of law.

111.    Plaintiff Cannaday is a shareholder of Helios Advantage, Helios High and Helios Strategic, was a shareholder of these funds at the time of the wrongdoing alleged herein, and has been a shareholder of these funds continuously since that time.

112.    Plaintiff Godfrey is a shareholder of Helios Advantage, Helios Multi-Sector and Helios Strategic, was a shareholder of these funds at the time of the wrongdoing alleged herein, and has been a shareholder of these funds continuously since that time.

113.    Plaintiffs will adequately and fairly represent the interests of the Funds and their

shareholders in enforcing and prosecuting the rights of the Funds.

114.   In November 2009, Plaintiffs made demands (the "Demands") on the Board to take action against Defendants.  Copies of the Demands are attached hereto as Exhibits A, B, C, D, E and F.

115.   On January 12, 2010, John J. Feeny, Jr. ("Feeny"), the current President of the Funds, sent identical letters to Plaintiffs' counsel acknowledging the Demands pertaining to the Funds claiming that:

> [I]n the course of related pending derivative litigation involving the former directors and/or officers and the former investment advisor of the Funds, the current Boards of Directors of the Funds are conducting an investigation to determine whether the Boards of Directors of the Funds should take action against the Funds' former directors, officers or investment advisor with respect to similar allegations.

116.   It is clear from Feeny's January 12, 2010 letters that the Board has not conducted, and does not intend to conduct, *any investigation whatsoever* regarding Plaintiffs' Demands. Indeed, while Plaintiffs are aware of previously "pending derivative litigation involving the former directors and/or officers and the former investment advisor of" Helios Multi-Sector, which is reported in the Funds' SEC filings, *e.g.,* the Funds' the semi-annual shareholder report on Form N-CSRS filed with the SEC on December 2, 2009 (the "December 2009 Semi-Annual Report"), and which has since been dismissed for failure to adequately allege demand futility, Plaintiffs are unaware of *any* "pending derivative litigation involving the former directors and/or officers and the former investment advisor of" Helios Advantage, Helios High and Helios Strategic.  In fact, these funds' SEC filings, *e.g.*, the December 2009 Semi-Annual Report, disclose *no* "pending derivative litigation" involving these funds.  Consequently, it is clear that the Board has done, and apparently intends to do, *nothing whatsoever* to investigate Plaintiffs' Demands with respect to Helios Advantage, Helios High and Helios Strategic, which is not, and

cannot be, a good faith response to Plaintiffs' Demands.

117.    Furthermore, the "investigation" that the Board is purportedly conducting with regard to Helios Multi-Sector has been going on for nearly three years, with no end in sight.  The Board has had more than a reasonable amount of time "to determine whether the Boards of Directors of the Funds should take action against the Funds' former directors, officers or investment advisor with respect to similar allegations," yet it has failed to do so.  The Board's never-ending "investigation" regarding Helios Multi-Sector is merely a pretense for doing nothing, and thus is not, and cannot be, a good faith response to Plaintiffs' Demands.

## COUNT I

### Against Defendants for Breach of Fiduciary Duties of Loyalty and Good Faith

118.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

119.    As alleged herein in detail, Defendants owed the Funds the fiduciary duties of good faith and loyalty.

120.    Defendants breached their fiduciary duties of good faith and loyalty, as alleged herein.

121.    As a direct and proximate result of their breaches of fiduciary duties, the Funds have sustained damages, as alleged herein.

## COUNT II

### Against Defendant MAM for Violation of
### Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b)

122.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

123.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b)

-41-

("Section 36(b)"), "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

124.    Defendant MAM was the investment adviser of the Funds, registered investment companies, and thus is "deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by" the Funds.

125.    Defendant MAM breached its fiduciary duty in respect of such compensation or payments paid by the Funds, as alleged herein.

126.    As a direct and proximate result of its breach of fiduciary duties, MAM received excessive fees, which the Funds are entitled to recover pursuant to Section 36(b).

<u>**COUNT III**</u>

**Against Defendant MAM for Unjust Enrichment**

127.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

128.    Defendant MAM was unjustly enriched by its receipt of excessive fees based on improperly inflated asset values, as alleged herein, and it would be unconscionable to allow it to retain the benefits thereof.

129.    To remedy defendant MAM's unjust enrichment the Court should order defendant MAM to disgorge to the Funds the excessive fees it received.

WHEREFORE, Plaintiffs demand judgment as follows:

a.    Awarding the Funds the amount of damages sustained by the Funds as a result of Defendants' breaches of fiduciary duties;

b.    Ordering defendant MAM to disgorge to the Funds the excessive fees it received;

c.      Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

d.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs, and expenses; and

e.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: December 6, 2010                            Respectfully submitted,

                                                  **BRAMLETT LAW OFFICES**
                                                  **By:**

                                                  **s/*Paul Kent Bramlett***
                                                  **PAUL KENT BRAMLETT TN#7387**

Paul Kent Bramlett   TN #7387/MS #4291
Robert Preston Bramlett    TN #25895
**BRAMLETT LAW OFFICES**
2400 Crestmoor Road
P. O. Box 150734
Nashville, TN  37215
Telephone:     (615) 248-2828
Facsimile:     (615) 254-4116
E-mail :       pknashlaw@aol.com
               Robert@BramlettLawOffices.com


**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Phone:  (610) 667-7706
Fax:  (267) 948-2512

*Attorneys for Plaintiffs*

**VERIFICATION**

I, Cecil Cannaday, hereby verify that I have authorized the filing of the attached Verified Consolidated Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty that the foregoing is true and correct.

DATE: _11-22-2010_

Cecil Cannaday