IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE, and ERISA LITIGATION | ) ) ) ) ) | |
| CECIL CANNADAY, et al., | ) ) | No.  MDL 2009 |
| Plaintiffs, | ) ) | 10-2188 |
| v. | ) ) | |
| BRIAN B. SULLIVAN, et al., | ) ) | |
| Defendants. | ) ) | |

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

Before the Court are three motions to dismiss in this shareholder derivative action. The first is Defendant Carter Anthony's ("Anthony") January 24, 2011 Motion to Dismiss. (Mot. to Dismiss, ECF No. 35.) ("Anthony's Mot.") Plaintiffs Cecil Cannaday ("Cannaday") and Ronald Godfrey ("Godfrey" and, collectively, "Plaintiffs") responded in opposition on July 19, 2011. (Pls.' Mem. of Law in Opp'n to Carter Anthony's Mot. to Dismiss, ECF No. 61.) Anthony replied on August 18, 2011. (Carter Anthony's Reply in Supp. of Mot. to Dismiss, ECF No. 67.) ("Anthony's Reply")

The second motion is the January 24, 2011 Motion to Dismiss filed by Defendants Morgan Asset Management, Inc. ("MAM"), Allen B. Morgan, Jr., J. Kenneth Alderman, Thomas R. Gamble, Charles D. Maxwell, Brian B. Sullivan, Joseph C. Weller, J. Thompson Weller ("Thompson Weller"), Michele F. Wood, James C. Kelsoe, Jr. ("Kelsoe"), and David H. Tannehill ("Tannehill") (collectively, the "MAM Defendants"). (Mot. to Dismiss Pls.' Consolidated Derivative Compl. by Morgan Asset Management, Inc. and the Individual Defs., ECF No. 41.) ("MAM's Mot.") Plaintiffs responded in opposition on July 19, 2011. (Mem. of Law in Opp'n to the Mot. to Dismiss Pls.' Consolidated Derivative Compl., ECF No. 63.) ("Resp. to MAM") MAM and the Individual Defendants replied on August 18, 2011. (Reply Mem. in Supp. of Mot. to Dismiss Pls.' Consolidated Derivative Compl., ECF No. 66-1.)

The third motion is the January 24, 2011 Motion to Dismiss filed by Defendants Jack R. Blair, Albert C. Johnson, James Stillman R. McFadden, W. Randall Pittman, Mary S. Stone, and Archie W. Willis, III (collectively, "Independent Directors"). (Mot. of Defs. Jack R. Blair, Albert C. Johnson, James Stillman R. McFadden, W. Randall Pittman, Mary S. Stone, and Archie W. Willis, III to Dismiss Pls.' Consolidated Shareholder Derivative Compl., ECF No. 44.) Plaintiffs responded in opposition on July 19, 2011. (Pls.' Mem. of Law in Opp'n to Mot. of Defs., ECF No.

62.)   ("Resp. to Independent Directors")   The Independent Directors replied on August 18, 2011.   (Former Independent Directors' Reply Mem. in Supp. of their Mot. to Dismiss Pls.' Verified Consolidated Shareholder Compl., ECF No. 68.) ("Independent Directors' Reply")

## I.   Background

Plaintiffs filed this shareholder derivative action on behalf of Helios Advantage Income Fund, Inc. ("Helios Advantage"), Helios High Income Fund, Inc. ("Helios High"), Helios Multi-Sector High Income Fund, Inc. ("Helios Multi-Sector"), and Helios Strategic Income Fund, Inc. ("Helios Strategic") (collectively, the "Funds").   (See Verified Consolidated Shareholder Derivative Compl. ¶ 1, ECF No. 33.) ("Am. Compl.")   Incorporated in Maryland, the Funds are closed-end investment management companies registered under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§ 80a-1 et seq., and their principal place of business is New York.[1]   (Id. ¶ 16.)   To begin selling shares to investors, the Funds filed registration statements and prospectuses with the Securities and Exchange Commission ("SEC") between April 2003 and November

---

[1] "A closed-end investment company, unlike a traditional open-end mutual fund, has fixed capitalization and may sell only the number of shares of its own stock as originally authorized. It does not redeem its securities at the option of the shareholder. Shares of a closed-end fund are traded on a secondary market; that is, its stock, like that of any publicly owned corporation, is usually listed on a national exchange." Green v. Nuveen Advisory Corp., 295 F.3d 738, 740 (7th Cir. 2002); accord Strougo v. Bassini, 282 F.3d 162, 165 (2d Cir. 2002).

2005, which incorporated by reference statements of additional information and other exhibits (collectively, the "Prospectuses"). (See id. ¶¶ 2, 41-48.) After filing with the SEC, the Funds began offering shares to investors exclusively through Morgan Keegan & Co., Inc. ("Morgan Keegan").[2] (See id. ¶¶ 9, 41-48.)

Cannaday holds shares of Helios Advantage, Helios High, and Helios Strategic and was a shareholder of those funds at the time of the alleged wrongdoing. (Id. ¶¶ 14, 111.) Godfrey holds shares of Helios Advantage, Helios Multi-Sector, and Helios Strategic and was a shareholder of those funds at the time of the alleged wrongdoing. (Id. ¶¶ 15, 112.)

A board of directors (the "Board") managed and supervised the Funds.[3] (Id. ¶ 49.) At the time of the alleged wrongdoing, Defendants J. Kenneth Alderman, Anthony, Thomas R. Gamble, Charles D. Maxwell, Allen B. Morgan, Jr., Brian B. Sullivan, Joseph C. Weller, Thompson Weller, and Michele F. Wood (collectively, the "Officer Directors") were directors of the Funds who were also corporate officers of the Funds.[4] (See id.

---

[2] When the Funds were affiliated with Morgan Keegan, they were known as RMK Advantage Income Fund, Inc., RMK High Income Fund, Inc., RMK Strategic Income Fund, Inc., and RMK Multi-Sector High Income Fund, Inc., respectively. (See Am. Compl. n. 1; Mem. in Supp. of Mot. to Dismiss Pls.' Consolidated Derivative Compl. by Morgan Asset Management, Inc. and the Individual Defs. 1, ECF No. 46 ("MAM's Mem.").) Morgan Keegan is not a party to this action.
[3] The complaint refers only to a single board of directors, not a separate board for each fund. (See, e.g., Am. Compl. ¶¶ 18-28, 30-33, 49-50.)
[4] All of the Officer Directors other than Anthony have joined MAM's motion to dismiss. (See MAM's Mot.) Anthony has filed a separate motion alleging that

¶¶ 18-19, 21, 23, 25, 28, 30-31, 33.)  Defendants Jack R. Blair, Albert C. Johnson, James Stillman R. McFadden, W. Randall Pittman, Mary S. Stone, and Archie W. Willis, III were independent directors of the Funds.  (See id. ¶¶ 20, 22, 24, 26-27, 32.)

MAM is a Tennessee corporation with its principal place of business in Tennessee.  (Id. ¶ 34.)  MAM served as the Funds' investment advisor until August 2007.  (Id.)  In that capacity, MAM provided the Funds with investment research and advice, "subject to the supervision of the Funds' Board."  (Id. ¶ 50.) "MAM determine[d] which portfolio securities [would] be purchased or sold, arrange[d] for the placing of orders for the purchase or sale of portfolio securities, select[ed] brokers or dealers to place those orders, maintain[ed] books and records with respect to the Funds' securities transactions[,] and report[ed] to the Board on the Funds' investments and performance."  (Id.)  For its services, the Funds paid MAM monthly compensation equal to a percentage of their average daily managed assets, as set out in agreements between the Funds and MAM and disclosed in the Funds' Prospectuses.  (Id. ¶ 51.)

Although MAM served as the Funds' investment adviser, day-to-day management of the Funds' portfolios was the

---

he was not a director of the Funds during the relevant time period, but, in his reply memorandum, he purportedly "adopts" the reply of MAM and the Officer Directors.  (See Anthony's Mot.; Anthony's Reply.)

responsibility of Kelsoe.  (Id. ¶ 50.)  Kelsoe served as the
Funds' senior portfolio manager from 2004 through July 2008.
(Id. ¶ 18.)  Tannehill served as assistant portfolio manager
from 2006 through 2008.  (Id. ¶ 29.)

Plaintiffs' allegations about Defendants' wrongdoing fall
into three categories.  In the first category are Plaintiffs'
allegations that Defendants[5] knowingly caused the Funds to invest
heavily in illiquid securities.  (See id. ¶¶ 8, 53-59.)  The
Prospectuses state that the Funds may not "purchase the
securities of any issuer (other than securities issued or
guaranteed by the U.S. government or any of its agencies or
instrumentalities) if, as a result, 25% or more of the Fund[s']
total assets would be invested in the securities of companies
the principal business activities of which are in the same
industry."  (Id. ¶ 53.)  That limitation could only be modified
with shareholder approval.  (See id. ¶ 4.)  Plaintiffs allege
that, despite the limitation, beginning in 2007, Defendants
knowingly caused or allowed the Funds to become overconcentrated
in "risky, illiquid securities," such as asset-based securities
("ABS"), mortgage-backed securities ("MBS"), and collateralized
debt obligations ("CDO").  (Id. ¶¶ 53-54.)  Those investments

---

[5] Plaintiffs' allegations generally refer to "Defendants," which they define
to include MAM, the Officer Directors, the Independent Directors, Kelsoe, and
Tannehill.  (See Am. Compl. ¶ 35.)  The Court uses the term "Defendants" to
refer to those parties.  Where Plaintiffs' allegations refer to a specific
defendant or group of defendants, the Court will say so.

resulted in more than 25 percent of the assets of each Fund invested in a single industry. (See id. ¶¶ 54-56.)

In the second category are Plaintiffs' allegations that Defendants knowingly failed to disclose to shareholders the Funds' exposure to these risky, illiquid securities. (See id. ¶ 8.) By early 2007, Defendants were aware of turmoil in the MBS market, but, rather than disclose the risks the Funds faced, Defendants issued false and misleading statements. (Id. ¶¶ 58-71.) Defendants filed financial reports with the SEC that concealed the Funds' losses by artificially inflating their net asset values ("NAV"). MAM and Morgan Keegan issued false and misleading sales materials from January 2006 through December 2007, and Kelsoe and Courtney H. Nash, MAM's director of marketing, gave false reassurances in response to investor inquires.[6] (See id. ¶¶ 61-62.)

On June 7, 2006, December 7, 2006, and June 6, 2007, the Funds filed certified shareholder reports with the SEC containing statements in their "Management Discussion of Fund Performance" sections that were false and misleading at the time they were issued and signed by Kelsoe. (See id. ¶¶ 63-69.)

---

[6] Plaintiffs support these allegations by relying on an Order Instituting Administrative and Cease-and-Desist Proceedings filed by the SEC against Kelsoe, Thompson Weller, MAM, and Morgan Keegan and a complaint filed by the Financial Industry Regulatory Authority ("FINRA") against Morgan Keegan. (See Am. Compl. ¶¶ 9-10, 61-62.) That those authorities have alleged the facts referred to in their proceedings and that Plaintiffs may have relied on the authorities' proceedings to draft their own allegations have no effect on this Court's analysis.

Those reports were false and misleading because they "(1) touted the diversification of the Funds' portfolios; (2) failed to disclose that Defendants invested heavily in MBSs, ABSs, and other illiquid risky securities; and (3) failed to disclose the true extent of the risks associated with such overconcentration and of the losses to the Funds." (Id. ¶ 70.)  Those SEC filings and the Funds' reports on February 28, 2007, and August 29, 2007, also included "inflated" NAVs for the Funds, which made them false and misleading for a second reason. (Id. ¶ 71.)

In the third category are Plaintiffs allegations that Defendants overstated the values of the Funds' "illiquid investments" to inflate the Funds' NAVs. (See id. ¶¶ 8, 72-94.) Because "judgment plays a greater role in the valuation process" when securities are illiquid, MAM's Valuation Committee determined the fair value of investments for which market quotations were unavailable or inaccurate "using procedures established by and under the direction of the Funds' Board." (Id. ¶¶ 73-74.)  The procedures established by the Board (the "Valuation Procedures") required the Valuation Committee to consider a series of general and specific factors, to maintain a written report documenting how each security's fair value was determined, and to periodically validate the values assigned to the securities through broker-dealer quotation checks and other tests. (Id. ¶ 76.)

Although the Funds' Board was responsible for pricing the securities in the Funds' portfolios, the Board delegated that responsibility by contract to Morgan Keegan, whose Fund Accounting Department ("Fund Accounting"), headed by Thompson Weller, priced the securities and calculated each Fund's NAV. (Id. ¶¶ 72, 75.)  Fund Accounting failed to follow the Valuation Procedures.  (Id. ¶ 76.)  Between January 2007 and July 2007, Fund Accounting accepted and relied on approximately 262 purported price adjustments from Kelsoe that were "arbitrary and did not reflect fair value," without requiring supporting documentation.  (Id. ¶¶ 77-78, 80.)  When Fund Accounting sought to check its valuations through broker-dealer quotes, Kelsoe "actively screened and manipulated" them.  (Id. ¶¶ 79-80.)  The Valuation Committee and Fund Accounting failed to reevaluate their valuations, allowing their prices to become stale.  (Id. ¶ 81.)  Thompson Weller knew or was reckless as to the failures to implement the Valuation Procedures.  (Id. ¶¶ 82-83.)

Although industry analysts recognized trouble in the subprime mortgage market as early as 2006, and various news outlets reported on the impending rise in subprime mortgage foreclosures, Kelsoe forestalled declines in the Funds' NAVs by manipulating the values of the securities in the Funds' portfolios.  (Id. ¶¶ 84-90.)  All Defendants, "in breach of their fiduciary duties[,] . . . knowingly and improperly delayed

writing down the value of these investments and knowingly failed to disclose the true financial performance of the Funds to shareholders." (Id. ¶ 91.) Defendants also concealed the Funds' excessive concentration in "risky illiquid securities" through misleading quarterly and annual reports that failed to disclose the fair values of those securities. (Id. ¶ 93.) Because MAM's compensation was based on the Funds' average daily managed assets, "MAM was overcompensated based on the Funds' improperly inflated asset values." (Id. ¶ 92.)

Defendants began to reveal their wrongful conduct on August 10, 2007, when Kelsoe wrote an open letter to investors describing valuation problems that the Funds were experiencing due to market volatility. (See id. ¶ 95.) On August 14, 2007, the Funds issued a current report stating that they had retained a valuation consultant. (Id. ¶ 95.) On December 5, 2007, the Funds filed semi-annual shareholder reports disclosing that their returns had declined by at least 35 percent and that their NAVs had dropped significantly over the past six months. (Id. ¶ 97.) The Funds explained that "any asset related to residential real estate had been devalued." (Id. ¶ 98.) On June 10, 2010, the Funds issued a current report announcing that their audit reports and financial statements for the fiscal years ending on March 31, 2006, March 31, 2007, March 31, 2008, and March 31, 2009, were no longer reliable. (Id. ¶ 100.) In a current

report issued on August 25, 2010, the Funds released restated financial statements for the fiscal year ending March 31, 2009, which showed that the NAV of each of the Funds had declined by not less than $7.8 million. (Id. ¶ 101.) As the Funds released this information, their share prices plummeted. (Id. ¶ 102.)

The SEC, the Financial Industry Regulatory Authority ("FINRA"), and various state regulators have brought complaints against MAM, Morgan Keegan, Kelsoe, Thompson Weller, and others based in part on these allegations. (Id. ¶¶ 103-05.) Plaintiffs made demand on the Funds' current board of directors (the "New Board") in November 2009, asking that it also initiate litigation against Defendants based on Plaintiffs' allegations. (Id. ¶¶ 114-15.) Although John J. Feeny, Jr. ("Feeny"), president of the New Board, responded by letter on January 12, 2010, stating that the Funds were conducting an investigation, Plaintiffs allege that the Funds have not investigated the alleged wrongdoing, that they do not intend to do so, and that they have not responded in good faith to Plaintiffs' demand. (Id. ¶¶ 116-17.)

Plaintiffs filed suit on March 18, 2010, and amended their complaint on December 6, 2010. (See Compl., ECF No. 1; Am. Compl.) They bring claims for (1) breach of fiduciary duty against all Defendants; (2) violation of Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), against MAM; and (3) unjust

11

enrichment against MAM. (Id. ¶¶ 118-29.) Defendants' motions to dismiss those claims are ripe for decision.

## II.  Jurisdiction & Choice of Law

### A. Subject Matter Jurisdiction

The Court has federal question jurisdiction over Plaintiffs' ICA claim against MAM. See 28 U.S.C § 1331. The Court has supplemental jurisdiction to hear Plaintiffs' related state-law claims. See 28 U.S.C. § 1367(a).

The Court also has diversity jurisdiction over Plaintiffs' state-law claims. See 28 U.S.C. § 1332(a)(1). Cannaday is a citizen of Arkansas, and Godfrey is a citizen of Washington. (Am. Compl. ¶¶ 14-15.) The Funds are incorporated under the laws of Maryland and have their principal place of business in New York. (Id. ¶ 16.) MAM is incorporated under the laws of Tennessee and has its principal place of business in Tennessee. (Id. ¶ 34.) Kelsoe, Tannehill, the Officer Directors, and the Independent Directors are all citizens of Alabama, Tennessee, or Virginia. (See id. ¶¶ 17-33.) Complete diversity exists. See 28 U.S.C. § 1332(a)(1). Plaintiffs allege that more than $75,000 is in controversy, and nothing suggests the amount has been asserted in bad faith. See Schultz v. General R.V. Ctr., 512 F.3d 754, 756 (6th Cir. 2008) (explaining that bad faith is established only if it appears "to a legal certainty" that the claim is for less than the jurisdictional amount) (citation

12

omitted); (Am. Compl. ¶ 12).  Because complete diversity exists and the amount-in-controversy requirement is satisfied, the Court has subject matter jurisdiction over Plaintiffs' state-law claims based on diversity of citizenship.  See 28 U.S.C. § 1332(a)(1).

### B. Choice of Law

When a federal court exercises diversity or supplemental jurisdiction over state-law claims, the court applies the choice-of-law rules of the forum state.  See Montgomery v. Wyeth, 580 F.3d 455, 459 (6th Cir. 2009); Menuskin v. Williams, 145 F.3d 755, 761 (6th Cir. 1998); see also Girgis v. Countrywide Home Loans, Inc., 733 F. Supp. 2d 835, 850-51 (N.D. Ohio 2010) (citations omitted).  Tennessee choice-of-law rules apply.

Plaintiffs' state-law claims sound in tort.  Tennessee has adopted the "most significant relationship" rule for torts under the Restatement (Second) of Conflict of Laws, which provides that "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."  Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992).  Because the Funds are incorporated in Maryland and Plaintiffs allege injury on behalf of the Funds, the injury occurred in Maryland.  (See Am. Compl. ¶ 16.)  All parties agree that Maryland law applies.  No other state has a

13

more significant relationship to the litigation. Therefore, Maryland substantive law applies to Plaintiffs' state-law claims. See Hataway, 830 S.W.2d at 59; see also GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998); In re Korean Air Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (D.C. Cir. 1991).

### III. Standard of Review

In addressing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007). A plaintiff can support a claim "by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563 (2007). This standard requires more than bare assertions of legal conclusions. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Any claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is

14

and the grounds upon which it rests.'" Id. (citing Twombly, 550 U.S. at 555). Nonetheless, a complaint must contain sufficient facts "to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949 (citation omitted). A plaintiff with no facts and "armed with nothing more than conclusions" cannot "unlock the doors of discovery." Id. at 1950.

When a plaintiff brings a derivative action to enforce a right that belongs to a corporation but that the corporation has not enforced, Federal Rule of Civil Procedure 23.1 heightens these notice-pleading requirements.[7] See McCall v. Scott, 239 F.3d 808, 815 (6th Cir. 2001); see also Auletta v. Ortino (In re Ferro Corp. Derivative Litig.), 511 F.3d 611, 617 (6th Cir. 2008). The complaint must allege that the plaintiff was a shareholder at the time of the transaction complained of and

---

[7] The parties dispute whether Federal Rule of Civil Procedure 9(b) also heightens the pleading standard applicable to the allegations in Plaintiffs' complaint. (See MAM's Mem. 7-8; Resp. to MAM 17-18.) Because the Court bases its decision on Plaintiffs' demand allegations alone, it need not address this dispute.

that the action is not a collusive one to confer jurisdiction on the court.  Fed. R. Civ. P. 23.1(b)(1)(1-2).  The complaint must also "state with particularity" all efforts undertaken by the plaintiff to demand that the corporation's board of directors take the desired action and "the reasons for not obtaining the action or not making the effort."  Id. 23.1(b)(1)(3).

Where the plaintiff believes demand would be futile, "[m]erely alleging futility will not suffice."  In re Ferro Corp. Derivative Litig., 511 F.3d at 618.  Rather, "the plaintiff must point to facts which show that the presumed ability of the directors to make unbiased, independent business judgments about whether it would be in the corporation's best interests to file the action does not exist in this case."  Id. (quoting Davis v. DCB Fin. Corp., 259 F. Supp. 2d 664, 670 (S.D. Ohio 2003) (emphasis in original)).  Where the complaint does not meet this heightened pleading standard, a court will dismiss it.  See id. at 623.

State law determines the contours of the demand requirement.  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 101 (1991).  Because the Funds are Maryland corporations, Maryland law determines the substantive components of the demand requirement.  Id.; (Am. Compl. ¶ 16).  Rule 23.1 governs the specificity with which Plaintiffs must plead facts sufficient to meet Maryland's substantive standard.  See Fed. R. Civ. P.

23.1(b)(1)(3); In re Ferro Corp. Derivative Litig., 511 F.3d at 618.

## IV.  Analysis[8]

"In order to sue derivatively on behalf of the corporation, a plaintiff shareholder must overcome a number of procedural hurdles and demonstrate that he or she, rather than the corporation itself, should control the litigation." Shenker v. Laureate Educ., Inc., 983 A.2d 408, 424 (Md. 2009).  Before filing suit on the corporation's behalf, the plaintiff must (1) "make a good faith effort to have the corporation act directly," an effort known as making demand on the corporation, or (2) demonstrate that making demand would be futile.  Id.; George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay, 14 A.3d 1193, 1208 (Md. Ct. Spec. App. 2011) (citations omitted).  "[A] court looks to the time plaintiff[s] filed [their] complaint to determine whether demand was proper." Ryan v. Morgan Asset Mgmt., Inc. (In re Regions Morgan Keegan Secs., Derivative, ERISA Litig.), 694 F. Supp. 2d 879, 884 (W.D. Tenn. 2010)

---

[8] Defendants have filed three separate motions.  Anthony and the MAM Defendants argue that, because Plaintiffs' claims are untimely or otherwise fail as a matter of law, they should be dismissed with prejudice.  (See Mem. in Supp. of Mot. to Dismiss Pls.' Verified Consolidated Shareholder Derivative Compl. by Carter Anthony 1-3, ECF No. 36; MAM's Mem. 9-28.)  Only the Independent Directors have moved for dismissal based on the demand requirement.  (See Mem. of Law in Supp. of Mot. to Dismiss Pls.' Verified Consolidated Shareholder Derivative Compl. 2, ECF No. 44-1.)  ("Independent Directors' Mem.")  Because the Court finds the Independent Directors' argument persuasive and concludes that Plaintiffs lack standing to bring this derivative action, it cannot reach the merits-based arguments raised by Anthony and the MAM Defendants.  See infra.

(interpreting Maryland law); accord Harris v. Carter, 582 A.2d 222, 228 (Del. Ch. 1990).

"Once demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation." Shenker, 983 A.2d 408, 424 (Md. 2009) (citations omitted); see also Boland v. Boland, 5 A.3d 106, 116 (Md. Ct. Spec. App. 2010) (citations omitted). If the corporation fails to take the action requested by the shareholders, the shareholders may bring a "demand refused" action. Shenker, 983 A.3d at 424. Once the shareholders have made demand on the board, they may not claim that the board was unable to act independently on the demand, but they may allege "that the board in fact did not act independently or that demand was wrongly refused." Bender v. Schwartz, 917 A.2d 142, 152 (Md. Ct. Spec. App. 2007) (citations omitted).

Demonstrating that demand would be futile is a narrow exception to the demand requirement. See Werbowsky v. Collomb, 766 A.2d 123, 144 (Md. 2001). As the Maryland Court of Appeals has explained, the exception applies

> only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be

18

expected to respond to a demand in good faith and within the ambit of the business judgment rule.

Id.; see also Kay, 14 A.3d at 1208 (citation omitted). The limited nature of the futility exception "does not preclude, however, appropriate judicial review, under the business judgment rule, of the response (or non-response) to a demand." Werbowsky, 766 A.2d at 144; see also Danielewicz v. Arnold, 769 A.2d 274, 291 (Md. Ct. Spec. App. 2001) (citations omitted).

The Independent Directors argue that this action should be dismissed because, when Plaintiffs made demand on the Funds' New Board, the New Board responded that it was investigating whether to pursue litigation against Defendants. (See Independent Directors' Mem. 2.) The Independent Directors rely on this Court's decision in Landers v. Morgan Asset Mgmt., Inc. (In re Regions Morgan Keegan Secs., Derivative, ERISA Litig.), 742 F. Supp. 2d 917, 924-25 (W.D. Tenn. 2010). Plaintiffs respond that Landers is not persuasive because, in that action, the Court denied defendants' motions to dismiss and stayed the proceedings and, here, none of the parties seeks a stay. (See Resp. to Independent Directors 4.)

Plaintiffs made demand on the New Board in November 2009.[9] (See Am. Compl. ¶¶ 114-15; Exs. A-F, ECF No. 33-1.) On January

---

[9] Plaintiffs have attached the letters they sent to the New Board demanding that it pursue litigation against Defendants. (See Exs. A-F, ECF No. 33-1.)

12, 2010, Feeny sent identical letters to Plaintiffs' counsel that acknowledged Plaintiffs' demand and stated:

> [I]n the course of related pending derivative litigation involving the former directors and/or officers and the former investment advisor of the Funds, the current Boards of Directors of the Funds are conducting an investigation to determine whether the Boards of Directors of the Funds should take action against the Funds' former directors, officers or investment advisor with respect to similar allegations.

(Id. ¶ 115.) Plaintiffs allege that Feeny's letter demonstrates "that the Board has not conducted, and does not intend to conduct, any investigation whatsoever regarding Plaintiffs' Demands" and that the New Board's purported investigation is not a "good faith response" to their demand. (Id. ¶¶ 116-17.)

Based on Plaintiffs' allegations, the futility exception does not apply. Because Plantiffs made demand on the New Board, they "have waived any claim they might otherwise have had that the [New Board] cannot independently act on the demand." See Bender, 917 A.2d at 152. Plaintiffs cannot show that "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." See Werbowsky, 766 A.2d at 144. There are no allegations about irreparable harm to the Funds if Plaintiffs cannot proceed with their derivative action before the New Board completes its

investigation.   Plaintiffs cannot show that "a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the" Funds.   See id.

Nor does Plaintiffs' action constitute a proper "demand refused" action.   See Shenker, 983 A.3d at 424.   Because Plaintiffs made demand on the New Board, it was required to "conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation."   Shenker, 983 A.2d at 424 (citations omitted); see also Boland, 5 A.3d at 116 (citations omitted).   According to the complaint, the New Board responded to Plaintiffs on January 12, 2010, by sending a letter stating that it would do just that.   (See Am Compl. ¶ 115.)   Rather than wait for the New Board to complete its investigation, Plaintiffs filed suit on March 18, 2010, approximately four months after their demand and approximately two months after the New Board's letter.[10]   (See Compl.)

Nothing in Maryland law suggests that plaintiffs who have made demand on a board of directors may bring a derivative action before the board has completed its investigation. Maryland law suggests the opposite.   See Shenker, 983 A.2d at 424 ("If the corporation, after investigation, fails to take the

---

[10] When Plaintiffs amended their complaint on December 6, 2010, they did not change the substance of their allegations about the New Board's response to their demand.   (Compare Am. Compl. ¶¶ 114-17, with Compl. ¶¶ 62-65.)

action requested by the shareholder, the shareholder may bring a 'demand refused' action.") (citations omitted) (emphasis added). "As a general rule, the business and affairs of a corporation are managed under the direction of its board of directors." Werbowsky, 766 A.2d at 133; see Shenker, 983 A.2d at 424 ("It is well established that courts generally will not interfere with the internal management of a corporation.") (citation and internal quotation marks omitted). Because a derivative action "necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors . . . , before being allowed to proceed with a derivative action, a shareholder first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed." Werbowsky, 766 A.2d at 134 (emphasis added); see also Kautz v. Sugarman, Nos. 10 Civ. 3478(RJS), 10 Civ. 4312(RJS), 2011 WL 1330676, at *5 (S.D.N.Y. Mar. 31, 2011) (explaining that, under Maryland law, "courts will not entertain derivative suits until it appears that the intra-corporate remedies have been unsuccessfully pursued by the complaining stockholder") (internal quotation marks and citation omitted).

Plaintiffs did not exhaust their intra-corporate remedies before filing their complaint. See Kautz, 2011 WL 1330676, at *5; Werbowsky, 766 A.2d at 134-35. They cannot allege that they made a good faith effort to have the Funds act directly and

22

explain why that effort did not succeed.  See Werbowsky, 766 A.2d at 134.  By filing suit only two months after the New Board responded to their demand, stating that it intended to investigate their claims, they did not give that effort the opportunity to succeed or fail.  Because the New Board had not completed its investigation when Plaintiffs filed suit, they lack standing to bring a "demand refused" action.  See Shenker, 983 A.2d at 424.

Because Plaintiffs lack standing, all that remains is to determine whether to dismiss their derivative complaint or stay this action pending the results of the New Board's investigation.  The Independent Directors argue that dismissal is proper.  (See Independent Directors' Mem. 2; Independent Directors' Reply 2.)  Plaintiffs note that the Court stayed the Landers action, pending the response of the board to plaintiffs' demand.  (See Resp. to Independent Directors 4.)

In the absence of authority, Maryland generally follows Delaware law.  See, e.g., Shenker, 983 A.2d at 427 (explaining that a divergence between Maryland and Delaware law was "a relatively rare rejection in Maryland of Delaware's acknowledged leadership in developing a coherent body of corporate law to which we and many other states ordinarily look for guidance"); Kramer v. Liberty Prop. Trust, 968 A.2d 120, 134 (Md. 2009) (noting that "the Delaware courts have gained a reputation for

their expertise in matters of corporate law"); see also Kautz, 2011 WL 1330676, at *6.  Under Delaware law, there is authority for dismissing a derivative action brought before the board of directors has completed its investigation.  See FLI Deep Marine LLC v. McKim, No. 4138-VCN, 2009 WL 1204363, at *4 (Del. Ch. Apr. 21, 2009) (explaining that "[o]nce a shareholder makes demand on the board, it must allow the board a reasonable time to investigate and respond to the claim prior to filing suit" and that, where plaintiffs file a premature derivative complaint, "the proper procedure is to dismiss the derivative complaint without prejudice, instead of staying the action and retaining jurisdiction") (citation omitted).  In Bender, however, the Maryland Court of Special Appeals approved the state trial court's decision to stay the suit pending the board's response to the plaintiff's demand.  917 A.2d at 150.

In Landers, this Court followed Bender and stayed the proceedings.  See 742 F. Supp. 2d at 923.  In Landers, however, there was no allegation that the board had responded to plaintiffs' demand.  See id.  Here, Plaintiffs allege that the New Board responded to their demand, stating it was investigating their allegations.  (See Am. Compl. ¶¶ 115-17.) Because Plaintiffs filed suit only two months after receiving the New Board's response, and before it had completed its investigation, "the proper procedure is to dismiss the

24

derivative complaint without prejudice." <u>See</u> <u>FLI Deep Marine</u> <u>LLC</u>, 2009 WL 1204363, at *4.  Plaintiffs' derivative complaint is DISMISSED.

### V.   Conclusion

Because demand was not futile and has not been refused, Plaintiffs lack standing to pursue this derivative action. Defendants' motions to dismiss are GRANTED, and Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE.

So ordered this 9th day of September, 2011.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE